Carmen NEREIDA–GONZALEZ,
Plaintiff, Appellant,

v.

Cirilo TIRADO–DELGADO, et
al., Defendants, Appellees.

No. 92–2084.

United States Court of Appeals,
First Circuit.

Heard March 1, 1993.

Decided April 14, 1993.

Before BREYER, Chief Judge,
TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

In this case, plaintiff-appellant Carmen Nereida–Gonzalez (Nereida), a veteran government employee displeased by a series of adverse employment actions, sued two of her superiors. The district court granted the defendants' motion for summary judgment. Nereida appeals. We affirm in part, reverse in part, and remand for further proceedings.

## · I.

### *Background*

We limn the facts in the light most advantageous to the summary judgment loser, consistent with record support, as Fed. R.Civ.P. 56 requires. *See, e.g., Amsden v. Moran*, 904 F.2d 748, 749 (1st Cir.1990), *cert. denied*, 498 U.S. 1041, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991).

Appellant, a known member of the New Progressive Party (NPP), started working for the Commonwealth of Puerto Rico in the 1960s. By 1984, she occupied a career position in the State Insurance Fund (SIF), a government agency.[1] In November of that year, the incumbent NPP governor lost the gubernatorial election to a member of the rival Popular Democratic Party (PDP). Hot on the heels of the change in command two PDP loyalists, defendants Cirilo Tirado–Delgado (Tirado) and Rafael Rivera Gonzalez (Rivera), received high-level SIF appointments—Tirado as Administrator of the SIF, Rivera as Director of Personnel.

Once ensconced at the agency, the defendants allegedly informed appellant that she would be demoted because of her political affiliation. The prophecy soon became a reality. By letter dated June 20, 1985, Rivera advised appellant that her position was being eliminated as part of a departmental reorganization and that, conse-

Hector Urgell Cuebas, San Juan, PR, for plaintiff, appellant.

Vannessa Ramirez, Asst. Sol. Gen. with whom Reina Colon de Rodriguez, Acting Sol. Gen., San Juan, PR, was on brief, for defendants, appellees.

---

1. Appellant served as executive assistant to SIF's Director of Administrative Services. The defendants did not urge below, and have not contend-

ed on appeal, that political affiliation is an appropriate criterion for this position.

quently, she was being transferred to a different SIF position as assistant to the Director of the Systems and Procedures Office. Rivera's letter acknowledged that "[t]his transfer represents a demotion."

Although the defendants now struggle to portray the reassignment as a lateral transfer, the record bears out Rivera's initial characterization of the move. The base salary for appellant's new position ($1565 per month) was significantly lower than the base salary for her former position ($1915 per month). The terms of her employment provided that, until the gap was closed, she would continue to be paid at her accustomed rate, but the difference between her new base salary and her actual pay would absorb any raises or bonuses she otherwise would have been eligible to collect. Thus, while appellant's pay was not reduced outright, it was effectively frozen and her ability to earn more money was circumscribed. This situation lasted at least until February 3, 1987, when Tirado informed appellant by letter that, in terms of salary and classification, her new position was being upgraded to the level of her previous position.

The demotion damaged appellant's pride as well as her pocketbook. Her new job, unlike her old one, did not entail supervisory responsibilities. What is more, even the modest functions and duties corresponding to the new job title were placed beyond her reach as she was asked to perform only clerical tasks. As a final indignity, although the defendants abolished appellant's former position on paper, its functions remained essentially intact and were performed by an employee with ties to the PDP.

Asserting that she had been constructively discharged, or, alternatively, demoted because of her exercise of First Amendment rights, and contending that the adverse personnel actions undertaken at defendants' direction deprived her of property without due process of law, appellant brought suit under 42 U.S.C. § 1983 (1988). She sought both equitable relief and money damages. The district court gave her cold gruel, entering summary judgment in de-

fendants' favor on all claims. This appeal followed.

## II.

### *Discussion*

### A

### *Summary Judgment*

Summary judgment exists to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Medicine,* 976 F.2d 791, 794 (1st Cir.1992), *petition for cert. filed,* 61 U.S.L.W. 3586 (U.S. Feb. 3, 1993) (No. 92–1334). Such a disposition is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue exists when there is evidence sufficient to support rational resolution of the point in favor of either party. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *United States v. One Parcel of Real Property, Etc.,* 960 F.2d 200, 204 (1st Cir.1992). A genuinely disputed issue concerns a material fact if the fact carries with it the potential to affect the outcome of the suit under the applicable law. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Rivera–Muriente v. Agosto–Alicea,* 959 F.2d 349, 352 (1st Cir.1992). This framework remains intact when qualified immunity issues are presented despite the potential of such defenses, in other ways, to "create strange procedural configurations." *Amsden,* 904 F.2d at 752.

Because the granting of summary judgment necessarily involves applying a legal standard to facts which must, by definition, be undisputed, appellate review of a district court order under Rule 56 is plenary. *See Wynne,* 976 F.2d at 794; *Amsden,* 904 F.2d at 752.

## B

### Constructive Discharge

 We need not tarry over appellant's most touted initiative: her claim that she was constructively discharged in reprisal for the free exercise of her First Amendment rights. We have ruled, squarely and recently, that a "claim of constructive discharge due to a demotion or transfer cannot succeed when a claimant, in fact, has not left employment." *Pedro–Cos v. Contreras,* 976 F.2d 83, 85 (1st Cir.1992) (per curiam) (collecting cases); *accord Rodriguez–Pinto v. Tirado–Delgado,* 982 F.2d 34, 37 (1st Cir.1993). In this instance, appellant concedes that she never left the SIF payroll. Accordingly, her constructive discharge claim fails as a matter of law.

## C

### Transfer and Demotion

Next, appellant claims that she was transferred and demoted for the same (impermissible) reason: to punish her for exercising prerogatives of free association and the like guaranteed to her by the First Amendment. Because this claim is scissile, its component parts are best treated separately.

### The Claim for Money Damages

 Insofar as appellant's First Amendment transfer-and-demotion claim is one for compensatory damages, we conclude that the doctrine of qualified immunity bars recovery. Qualified immunity shields government officials performing discretionary functions from civil liability for money damages when their conduct does not violate "clearly established" statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

The determination is time-critical. *See, e.g., Goyco de Maldonado v. Rivera,* 849 F.2d 683, 684 (1st Cir.1988). Here, the key actions of which appellant complains occurred before 1989. This court had not yet decided *Agosto–De–Feliciano v. Aponte–Roque,* 889 F.2d 1209 (1st Cir.1989) (en banc) and the Supreme Court had not yet decided *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). As we explain below, this chronology gets the grease from the goose.

Before 1989, that is, throughout the period when the present defendants allegedly acted to appellant's detriment,[2] it was a subject of much conjecture whether the constitutional prohibition against politically motivated firings extended to other personnel actions, such as refusals to hire, demotions, and failures to promote. *See Rodriguez–Pinto,* 982 F.2d at 38; *Aviles–Martinez v. Monroig,* 963 F.2d 2, 6 (1st Cir. 1992); *Roque–Rodriguez v. Lema Moya,* 926 F.2d 103, 107–09 (1st Cir.1991); *Nunez–Soto v. Alvarado,* 918 F.2d 1029, 1030 (1st Cir.1990). In the absence of a clearly established right on the part of public employees—even civil servants—to engage in politics without fear of demotion, the irresistible conclusion is that the instant defendants are entitled to don the cloak of qualified immunity. Therefore, the lower court appropriately scotched appellant's claim for compensatory damages at the summary judgment stage.[3]

### The Claim for Equitable Relief

 The remaining furculum of appellant's First Amendment transfer-and-demotion claim has more meat on its bones. A primary purpose of providing officials with qualified immunity is to ensure that fear of personal liability will not unduly influence or inhibit their performance of public

---

**2.** The record is tenebrous as to whether petty harassment (*e.g.,* shortstopping of responsibilities) continued after 1989. But, it is apparent that, by then, the major hardships (*e.g.,* reduced compensation) had been ameliorated. Thus, there seems to be little basis for arguing that, in 1989, *Agosto–De–Feliciano* stripped the cloak of qualified immunity from the defendants vis-a-vis any remnants of the alleged mistreatment thereafter occurring, and, indeed, appellant has made no such argument on appeal.

**3.** Appellant has not asserted that her claim for compensatory damages should proceed against the defendants in their official capacities, and we do not consider, therefore, whether sovereign immunity would bar the maintenance of such an action in federal court.

duties. *See, e.g., Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *Harlow,* 457 U.S. at 814, 102 S.Ct. at 2736; *Carlson v. Green,* 446 U.S. 14, 21 n. 7, 100 S.Ct. 1468, 1473 n. 7, 64 L.Ed.2d 15 (1980). This purpose is achieved when the official is held harmless from personal liability. Not surprisingly, then, qualified immunity confers immunity only from individual-capacity suits, such as suits for money damages, that have been brought against government actors.

Here, Nereida sued the defendants both individually and in their official capacities. As we have explained, the doctrine of qualified immunity sets the individual-capacity claims to rest. But, the official-capacity claims are qualitatively different: when a plaintiff sues a state official in the latter's *official* capacity, as opposed to the latter's *personal* capacity, the underlying rationale for qualified immunity has no bite.

■ An official capacity suit is, in reality, a suit against the governmental entity, not against the governmental actor. *See Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3104–05, 87 L.Ed.2d 114 (1985); *Brandon v. Holt,* 469 U.S. 464, 471–72, 105 S.Ct. 873, 877–78, 83 L.Ed.2d 878 (1985); *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978); *American Policyholders Ins. Co. v. Nyacol Prods., Inc.,* 989 F.2d 1256, 1259–1260 (1st Cir.1993); *Northeast Fed. Credit Union v. Neves,* 837 F.2d 531, 533 (1st Cir.1988). Consequently, when a plaintiff seeks equitable relief from a defendant in his capacity as an officer of the state, qualified immunity is not a viable defense. *See, e.g., Wood v. Strickland,* 420 U.S. 308, 314 n. 6, 95 S.Ct. 992, 997 n. 6, 43 L.Ed.2d 214 (1975) (stating that "immunity from damages does not ordinarily bar equitable relief"); *Rodriguez–Pinto,* 982 F.2d at 38–40 (vacating summary judgment with respect to claims for equitable redress notwithstanding defendants' qualified immunity). So it is here. To the extent that appellant, on First Amendment grounds, seeks equitable relief such as reinstate-

ment in her former position, the defense of qualified immunity does not obtain.

Absent the interposition of qualified immunity, we must look to what rights we now believe the law conferred on a government worker at the time in question, rather than merely seeking to ascertain what rights were clearly established at that time. *See Rodriguez–Pinto,* 982 F.2d at 38–40. We begin this probe by gauging the respective gravitational pulls exerted by *Agosto–De–Feliciano* and *Rutan* as they palpitate in this case.

In *Agosto–De–Feliciano,* we determined that the First Amendment's proscription of patronage dismissals as formulated by the Court in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), encompasses situations in which a government employer's actions fall short of discharge or constructive discharge but nonetheless result in an altered work situation "unreasonably inferior to the norm" for the position in question. *Agosto–De–Feliciano,* 889 F.2d at 1218 (internal quotation marks omitted). We coupled this substantive standard with a procedural requirement that the plaintiff establish the change in conditions "by clear and convincing evidence." *Id.* at 1220.

Shortly after we decided *Agosto–De–Feliciano,* the Supreme Court cast further illumination on the issue. In *Rutan,* 497 U.S. at 78–79, 110 S.Ct. at 2739, the Court extended the *Elrod/Branti* principles to government employment decisions concerning hiring, promotion, transfer, and recall of public employees. It is an interesting question whether some vestige of *Agosto–De–Feliciano* survives *Rutan,* thereby providing a sort of halfway house—an intermediate First Amendment haven for employees wounded by slings and arrows less damaging than those described by the *Rutan* Court. But if there are cases that elude *Rutan* yet still come within *Agosto–De–Feliciano's* reach—a matter which we need not decide—instances of actual demotion are not among them. While *Rutan's* precise contours may arguably be indistinct, it is clear that *Rutan's* doctrinal

influence suffuses situations in which an employee has actually been demoted.

■ Under *Rutan*, then, a plaintiff who has held a non-policymaking job in the public sector may ordinarily forestall summary judgment by pointing to evidence in the record which, if credited, would permit a rational factfinder to conclude that a demotion occurred and that it stemmed from a politically based discriminatory animus. Nereida passes this test.

■ There can be no disputing that the record contains evidence sufficient to justify a trier in finding that a demotion occurred. Under the NPP-led regime, appellant occupied a position with supervisory and coordinating functions. When the new regime settled in, she was shifted to a less lustrous position in a lower pay bracket. Her affidavit also relates that she was effectively deprived of raises and similar due-course increments, divested of supervisory powers, and assigned "only nominal tasks ... of a clerical nature." These facts, if proven, together with defendants' contemporaneous characterization of her transfer as a step down, would unquestionably permit a finding that appellant was, in fact, demoted.

■ Appellant has likewise adduced sufficient evidence of discriminatory animus. According to her affidavit, the defendants told her outright that she would "be demoted and assigned to another position without any responsibilities or duties" because of her NPP affiliation. This direct evidence of discriminatory animus, although denied by defendants, is adequate to ward off summary judgment on the point. *Cf.* Fed. R.Evid. 801(d)(2)(A) (statements of party-opponent made in either an individual or a representative capacity are not considered

hearsay). In this case, moreover, the direct evidence is buttressed by other facts of record from which a factfinder could reasonably conclude that: (1) appellant was a known member of the NPP; (2) she was transferred on the premise of what some evidence indicates was a sham reorganization; and (3) a number of other personnel actions allegedly occurred at about the same time, all of which involved insinuating PDP members into career positions previously held by NPP members. On this scumbled record, a reasonable factfinder, drawing inferences favorable to appellant and making credibility determinations in her favor, could easily conclude that the defendants acted out of discriminatory animus.[4]

Because our canvass of the record reveals evidence which, if credited, would warrant a reasonable factfinder in concluding that appellant was entitled to reinstatement and, perhaps, other equitable redress,[5] the district court swept too broadly in entering summary judgment across the board.

**D**

***Due Process***

Appellant also assigns error anent the handling of her due process claim—a claim which was presumably foreclosed by the entry of summary judgment but which the court below never specifically mentioned in its opinion. Pressing an analogy to *Rodriguez–Pinto*, 982 F.2d at 41, defendants suggest that appellant waived this argument by failing to advance it straightforwardly in the district court. We find that the claim was adequately preserved and,

---

**4.** To be sure, even if a plaintiff adduces evidence that her job loss was politically motivated, her employer may still prevail by demonstrating that the employee would have been ousted anyway, say, for unsatisfactory work performance or as a legitimate casualty of a bona fide reorganization. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Agosto–De–Feliciano*, 889 F.2d at 1220; *Hartman v. City of Providence*, 636 F.Supp. 1395, 1416–17 (D.R.I.1986). But, since the record before us

reflects genuine questions of material fact as to why Nereida was demoted, the defendants' explanations must be tested in the crucible of a trial.

**5.** Given the myriad factual uncertainties that dot the record, we leave to the court below three related questions: (1) whether a job still exists into which appellant might be reinstated, (2) whether appellant can collect back pay, and (3) if so, the amount thereof.

therefore, direct the district court to consider it on remand.

While we could, of course, search to ascertain whether summary judgment might be affirmable "on any independently sufficient ground made manifest by the record," *One Parcel*, 960 F.2d at 204, we see no reason to decide an issue which the district court appears to have overlooked, especially since we must remand the case for further consideration of another claim. *See supra* Part II(C). Accordingly, we vacate the entry of summary judgment as it pertains to the due process claim. We intimate no opinion as to the ultimate resolution of this aspect of the case.

### III.

### *Conclusion*

We need go no further. For the reasons stated we affirm the district court's entry of summary judgment on appellant's constructive discharge claim and on her First Amendment claims against the defendants in their individual capacities; we reverse the district court's entry of summary judgment on appellant's First Amendment claim for equitable redress against the defendants in their official capacities; and we vacate the order for summary judgment insofar as it purports to foreclose appellant from further prosecution of her due process claim.

*Affirmed in part, reversed in part, and remanded for further proceedings consistent herewith. Two-thirds costs to appellant.*