**Franco ACEVEDO–DIAZ, et al., Plaintiffs, Appellees,**

v.

**Jose E. APONTE, et al., Defendants, Appellees,**

**Ada N. Perez, et al., Plaintiffs, Appellants.**

**Franco ACEVEDO–DIAZ, et al., Plaintiffs, Appellees,**

v.

**Jose E. APONTE, et al., Defendants, Appellees,**

**Dorotea Collazo Rivera, et al., Plaintiffs, Appellants.**

Nos. 92–1846, 92–1848.

United States Court of Appeals, First Circuit.

Heard Feb. 4, 1993.

Decided Aug. 3, 1993.

Raul Barrera Morales, Santurce, PR, for plaintiffs, appellants.

William Reyes Elias, Hato Rey, PR, with whom Cesar R. Miranda Law Office, San Juan, PR, was on brief, for defendants, appellees.

Before SELYA, CYR and STAHL, Circuit Judges.

CYR, Circuit Judge.

In November 1984, Jose E. Aponte, the candidate of the Popular Democratic Party ("PDP"), was elected mayor of the Municipality of Carolina ("City"), Puerto Rico, defeating the incumbent mayor, Roberto Iglesias, the candidate of the New Progressive Party ("NPP"). During his first year in office, Mayor Aponte either terminated, or refused to renew, several hundred non-policymaking city employees hired under the previous administration. In letters of dismissal to the employees, Aponte claimed that the City faced a severe fiscal crisis, and disclosed various criteria for determining which municipal employees were to be terminated in order to effect the necessary economies:

(1) employees hired without compliance with Commonwealth or municipal personnel laws and regulations, see, e.g., P.R.Laws Ann. tit. 3, §§ 1331–1337, which dictate the public posting of available positions and competitive examinations;

(2) employees hired or promoted during the 1984 "veda," or "electoral prohibition period," a four-month "window" before and after a municipal election during which hiring, renewals, or pro-

motions by the incumbent administration are proscribed by law;

(3) employees who submitted no documentary proof that they possessed the minimum education and experience required for their positions;

(4) employees whose job positions were deemed nonessential, and therefore expendable; or

(5) employees who had committed employment infractions (e.g., unexcused leaves of absence, chronic tardiness).

■ In March 1986, 357 terminated employees, claiming political affiliation with the ousted NPP, brought the present civil rights action under 42 U.S.C. § 1983 against the City, Mayor Aponte, Jose A. del Valle (at times, the acting mayor), and Felix Martinez (the personnel officer). Plaintiffs alleged that their dismissals were due solely to their NPP affiliation, in violation of their First Amendment and due process rights under the United States Constitution. The complaint demanded compensatory and punitive damages, as well as reinstatement.[1]

The claims of 255 plaintiffs went to the jury following a four-month trial, and defendant verdicts were returned on the claims of 240 plaintiffs. Six plaintiffs were awarded compensatory damages (from $1700 to $10,440) against the City, and punitive damages ($25,000) against Aponte, while nine plaintiffs were awarded nominal damages ($1.00) against the City,[2] and punitive damages ($25,000) against Aponte. The district court denied all claims for reinstatement. Finally, in May 1992, the court set aside all fifteen plaintiff verdicts. The present appeal is

---

**1.** Three municipal employee classifications were involved in the challenged terminations: (1) "regular" employees, occupying permanent or career municipal positions, (2) "transitory" employees, appointed without the usual personnel screening procedures (e.g., postings and competitive examinations), but subject to periodic renewals at the expiration of their fixed terms, and (3) "contractual" workers, hired for fixed terms under federally funded programs (e.g., HUD) administered by the City. "Transitory" employees lack tenure, or a reasonable expectation in the indefinite continuation of their employment after the expiration of their fixed term. While their lack of a property interest in their employment positions generally precludes due process claims

for a politically discriminatory dismissal, First Amendment discrimination claims are not precluded. See Santiago–Negron v. Castro–Davila, 865 F.2d 431, 436 (1st Cir.1989); Estrada–Izquierdo v. Aponte–Roque, 850 F.2d 10, 16 (1st Cir.1988).

**2.** On appeal, certain plaintiffs demand a new trial on compensatory damages, arguing that the jury had no choice but to credit their testimony on damages, especially as it related to their mental suffering and anguish. We summarily reject their argument, as wholly unsupported by the record.

brought by eleven of the fifteen disappointed plaintiffs.

## DISCUSSION

### A. Standard of Review and Applicable Law

 A jury verdict may not be set aside as a matter of law under Fed.R.Civ.P. 50(b) except on a " 'determination that the evidence could lead a reasonable person to *only one conclusion.*' " *Hiraldo–Cancel v. Aponte*, 925 F.2d 10, 12 n. 2 (1st Cir.) (quoting *Conway v. Electro Switch Corp.*, 825 F.2d 593, 598 (1st Cir.1987)) (emphasis added), *cert. denied*, —— U.S. ——, 112 S.Ct. 637, 116 L.Ed.2d 655 (1991); *see Ferrer v. Zayas*, 914 F.2d 309, 311 (1st Cir.1990). On *de novo* review, the court of appeals will uphold the verdict unless the facts and inferences, viewed in the light most favorable to the verdict, "point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have [returned the verdict]." *Hendricks & Assocs., Inc. v. Daewoo Corp.*, 923 F.2d 209, 214 (1st Cir.1991); *Ferrer*, 914 F.2d at 311; *Mayo v. Schooner Capital Corp.*, 825 F.2d 566, 568 (1st Cir.1987).

 In a political discrimination case, *see Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), plaintiffs must bear the threshold burden of producing sufficient direct or circumstantial evidence from which a jury reasonably may infer that plaintiffs' constitutionally protected conduct—in this case, political affiliation with the NPP—was a "substantial" or "motivating" factor behind their dismissal.[3] *See Ferrer*, 914 F.2d at 311; *Estrada–Izquierdo v. Aponte–Roque*, 850 F.2d 10, 13 (1st Cir.1988); *Rosaly v. Ignacio*, 593 F.2d 145, 148–49 (1st Cir.1979). Once plaintiffs clear the threshold, the burden shifts to defendants to *articulate* a nondiscriminatory ground for the dismissals, *and prove by a preponderance of the evidence* that plaintiffs would have been dismissed regardless of their political affiliation. *See Givhan v.*

*Western Line Consol. Sch. Dist.*, 439 U.S. 410, 416, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979); *Rodriguez–Pinto v. Tirado–Delgado*, 982 F.2d 34, 39 (1st Cir.1993); *Kercado–Melendez v. Aponte–Roque*, 829 F.2d 255, 264 (1st Cir.1987), *cert. denied*, 486 U.S. 1044, 108 S.Ct. 2037, 100 L.Ed.2d 621 (1988). Either this "but for" causation test, or the defendant-employer's "*Mt. Healthy* defense," ensures that a plaintiff-employee who would have been dismissed in any event on legitimate grounds is not placed in a better position merely by virtue of the exercise of a constitutional right irrelevant to the adverse employment action. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 284, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977); *Acosta–Sepulveda v. Hernandez–Purcell*, 889 F.2d 9, 13 (1st Cir.1989); *Rosaly*, 593 F.2d at 148.

After a careful summarization of the trial evidence, the district court granted defendants' Rule 50(b) motion for judgment as a matter of law because the bulk of the circumstantial evidence relied on by plaintiffs—namely, their party affiliation and the temporal proximity between their dismissals and Mayor Aponte's inauguration—was too conjectural and conclusory to counteract the "overwhelming" *Mt. Healthy* defense, which demonstrated that massive layoffs were compelled as a result of the severe fiscal crisis brought on by the overhiring of City personnel under the previous administration. *See Kauffman v. Puerto Rico Tel. Co.*, 841 F.2d 1169, 1172 (1st Cir.1988) (finding that plaintiffs failed to allege the type of *specific* evidence of politically discriminatory animus required to avoid summary judgment).

The district court opinion compares the *Mt. Healthy* burden-shifting mechanism to similar devices used in other employment discrimination cases, such as Title VII cases, *see, e.g., Chamberlin v. 101 Realty, Inc.*, 915 F.2d 777, 782 (1st Cir.1990), and ADEA cases, *see, e.g., Goldman v. First Nat'l Bank*, 985 F.2d 1113, 1116–18 (1st Cir.1993). The opinion states that, once the defendant interposes the *Mt. Healthy* defense, "the plaintiff

---

**3.** The defendants do not contend that any appellant held either a confidential or a policymaking position for which partisan political affiliation

might have been a legitimate requirement. *See Branti*, 445 U.S. at 508, 100 S.Ct. at 1289; *An-*

then has the opportunity to demonstrate that the alleged nondiscriminatory reason is a false pretext," which may be accomplished either by " 'persuading the [jury] that a discriminatory reason more likely motivated the employer or indirectly by showing that [the] employer's proffered explanation is unworthy of credence.' " Dist.Ct. Op., at 4 (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981) (Title VII case)). Although literally correct, the quoted statement gives us pause, especially in light of the citation to *Burdine.* Since a proper allocation of the burden of persuasion is critical to our assessment of the district court's decision under Rule 50(b), we first revisit the applicable burden-shifting procedure.

■ Under Title VII, a plaintiff must establish a *prima facie* case of employment discrimination, at which point a presumption of discrimination attaches to the plaintiff's claim. A limited burden of production then passes to the employer to *articulate* a legitimate, nondiscriminatory reason for its actions, a burden which is fully satisfied if the employer submits enough evidence to raise a genuine issue of material fact. The employer need not submit sufficient evidence to "persuade the [fact finder]." *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. In other words, notwithstanding the interim shift in the burden of production to the employer, the plaintiff-employee in a Title VII case "retains the burden of persuasion" *at all times. Id.*

■ By contrast, under the *Mt. Healthy* burden-shifting mechanism applicable to a First Amendment political discrimination claim, the *burden of persuasion itself passes to the defendant-employer* once the plaintiff produces sufficient evidence from which the fact finder reasonably can infer that the plaintiff's protected conduct was *a* "substan-

tial" or "motivating" factor behind her dismissal. Accordingly, once the burden of persuasion shifts to the defendant-employer, the plaintiff-employee will prevail unless the fact finder concludes that the defendant has produced enough evidence to establish that the plaintiff's dismissal would have occurred in any event for nondiscriminatory reasons.

■ Therefore, we can sustain a Rule 50(b) reversal in a political discrimination case only if: (1) the record evidence *compelled* the conclusion that the plaintiff would have been dismissed in any event for nondiscriminatory reasons, or (2) the plaintiff did not introduce sufficient evidence in the first instance to shift the burden of persuasion to the defendants. We address these alternatives in turn.

### B. *The "Austerity" Defense*

Through numerous expert witnesses and statistical data,[4] defendants attempted to establish that all the challenged dismissals were due to the fiscal crisis inherited by Mayor Aponte when he took office in 1985, which the defendants attributed to mismanagement or illegal patronage hiring practices on the part of the previous administration. The jury reasonably could have found that the dismissals made by the incoming administration resulted in a 32% net reduction of approximately 900 City employees (from 2,869 to 1,966), and that no new employees were hired to perform the duties of the dismissed plaintiffs. Thus, the jury reasonably could have concluded that a bona fide fiscal crisis would have compelled the vast majority of the challenged dismissals even if the targeted employees had not been affiliated with the NPP.

■ Defendants' well-deployed "austerity" defense apparently thwarted the claims of 240 of the 255 plaintiffs whose cases went to

---

*thony v. Sundlun,* 952 F.2d 603, 605 (1st Cir. 1991).

4. For example, defendants presented the following uncontroverted evidence: 1) in 1985, there were approximately 2,900 City employees, including 906 "transitory" employees, 459 of whom had been appointed by the former administration in fiscal year 1984 alone; 2) the former mayor had made 250–300 appointments between July and October 1984; 3) in 1984, despite warn-

ings about the City's worsening budgetary problems, the former mayor renewed *all* transitory employees' expiring appointments; 4) by 1985, the personnel payroll comprised 80% of the City's budget; 5) in 1985, defendant Aponte inherited a debt of $116 million, which has since been reduced to $30 million, and an accumulated deficit of $30 million, since reduced to $3 million; and 6) by 1991, there were 1,966 City employees, only eight of whom were "transitory" employees.

the jury. But blunt instruments make crude scalpels, and the *Mt. Healthy* defense requires individualized scrutiny by the jury with a view to whether a particular plaintiff's position would have been eliminated under Aponte's austerity program *but for* the plaintiff's NPP affiliation. In other words, even though defendants' overarching austerity defense may have established that massive dismissals were imperative, it did not compel jury verdicts adverse to *all* plaintiffs. General statistical data regarding *net* work-force reductions may mask individual dismissals which were purely discriminatory. Here, some plaintiffs testified that their positions remained intact after their termination and specifically identified their replacements; the jury was free to credit this testimony, despite testimony to the contrary. *See Veranda Beach Club Ltd. Partnership v. Western Sur. Co.,* 936 F.2d 1364, 1385 (1st Cir.1991) ("Once the threshold of sufficiency has been crossed, the credibility of a claimant and its witnesses presents a question for the jury, not for the trial court—and most of all, not for the court of appeals.").

▋ Credibility determinations and evidence weighing are not grist for the Rule 50(b) mill. *Hendricks,* 923 F.2d at 214. As defendants were required to carry the *burden of persuasion,* and the evidence supporting the *Mt. Healthy* "austerity" defense did not compel jury acceptance of the claims of all 255 plaintiffs, we turn to the evidence bearing on the individual claims of the eleven appellants.

5. Some of the proffered justifications for defendants' employment actions must be pared to accord with applicable law. Although evidence that an employee was hired in violation of Commonwealth law precludes a finding that the employee possessed a property interest in continued employment, and hence a cognizable *due process* claim, *Kauffman,* 841 F.2d at 1173, evidence that an employee's appointment was a "nullity" under Puerto Rico law *ab initio* does not control a claim alleging a violation of the employee's First Amendment right of political affiliation, *see Hiraldo–Cancel,* 925 F.2d at 13 (" 'We do not think that a new administration can use the "nullity" of appointments doctrine as a cover for discharges, transfers, and discrimination based solely on political affiliation' ") (quoting *Santiago–Negron v. Castro–Davila,* 865 F.2d 431, 436–37 (1st Cir. 1989)). Although defendants argue that the rationale of *Santiago–Negron* applies only if the

## C. *The Individualized Defenses*

▋ The defendants attempted to establish their individualized *Mt. Healthy* defenses at trial based largely on the contemporaneous justifications relied on in Mayor Aponte's letters of dismissal. *See supra* p. 65. Under the *Mt. Healthy* burden-shifting mechanism, the employer's contemporaneous justifications for an adverse employment action serve at least two important functions. First, to the extent the reasons given by the employer at the time of the dismissal are later proven false or frivolous, the weight of the evidence of discriminatory animus may be enhanced, thereby contributing significantly to the threshold *Mt. Healthy* showing the plaintiff-employee must make in order to shift the ultimate burden of persuasion to the defendant-employer. Second, once the burden of persuasion has shifted to the employer, the jury would be entitled to find for the plaintiff-employee were it to conclude that the employer did not offer sufficient evidence to demonstrate that (i) the proffered reason for the dismissal was genuine *or* (ii) a bona fide basis existed which would have prompted the dismissal without regard to the employee's political affiliation. We reserve these individualized defenses for consideration with plaintiffs' evidence.

▋ Leaving aside certain proffered justifications for employee dismissals in the First Amendment political discrimination context,[5] only two individualized defenses re-

new administration *continues* to hire new personnel in violation of the Personnel Act, *Santiago–Negron* rested on the ground that state law does not and cannot *define* First Amendment rights. *Santiago–Negron,* 865 F.2d at 436. We do not suggest, however, that *evidence* relating to the plaintiff-employee's qualifications under the applicable personnel regulations is immaterial. For example, an employee's lack of qualifications for the position, *at the time of the dismissal,* may well be considered a nondiscriminatory basis for the dismissal. The jury must determine whether such a lack of qualifications was a real or pretextual justification for the dismissal.

On analogous reasoning, we discount two variations on the same defensive theme. First, the fact that some plaintiffs were appointed or promoted during the "veda," the electoral prohibition period, is not necessarily controlling in the First Amendment context. "Puerto Rico law is

main for our consideration in the present case, based on the evidence relating to each appellant's claim: (1) whether the plaintiff was qualified for the position at the time of the dismissal, and (2), if so, whether the position was eliminated for nondiscriminatory reasons.

### D. *Plaintiffs' Evidence*

■ Plaintiffs offered little direct evidence of discriminatory animus. *But see infra* notes 6 & 8. Nevertheless, as we have held, "circumstantial evidence alone can support a finding of political discrimination." *Anthony,* 952 F.2d at 605; *Estrada–Izquierdo,* 850 F.2d at 14. Certain general observations can be made concerning the circumstantial evidence bearing on the claims of all eleven plaintiffs. Mere temporal proximity between a change of administration and a public employee's dismissal is insufficient to establish discriminatory animus. *Cf. Aviles–Martinez v. Monroig,* 963 F.2d 2, 5 (1st Cir.1992) (citing *Kauffman,* 841 F.2d at 1172). On the other hand, we have noted that the "highly charged political atmosphere" occasioned by the major political shift from the NPP to the PDP throughout the Commonwealth of Puerto Rico in 1984, coupled with the fact that plaintiffs and· defendants are of competing political persuasions, may be *probative* of discriminatory animus. *See Kercado–Melendez,* 829 F.2d at 264; *see also Anthony,* 952 F.2d at 606 ("timing" of dismissal may be suggestive of discriminatory animus); *Estrada–Izquierdo,* 850 F.2d at 15 (same). Moreover, the record discloses that these eleven appellants, for the most part, were not quiescent NPP members but played very active or prominent roles in its political activities, publicly and vocally supporting the reelection campaign of the former mayor. *See Nereida–Gonzalez v. Ti-*

*rado–Delgado,* 990 F.2d 701, 706 (1st Cir. 1993) (noting evidence that plaintiff was "known" party member); *Ferrer,* 914 F.2d at 312 (noting that plaintiffs' political affiliation was not only "well known" but, in some instances, notorious); *Kercado–Melendez,* 829 F.2d at 264 (noting plaintiff's "long, active, and visible membership" in the opposition party).

■ Appellants variously testified at trial that they were (1) members · of the former mayor's elite "advance team," a corps of uniformed functionaries responsible for arranging campaign appearances; (2) organizers or participants in pro-NPP political rallies; (3) NPP women and youth coordinators; or (4) polling unit officers or members of electoral colleges. Thus, the jury reasonably could have concluded that those appellants who were publicly identified as close political allies of the former NPP mayor were more conspicuous targets for political discrimination. Standing alone, even the circumstantial evidence that some plaintiffs were especially conspicuous targets for discriminatory employment action by defendants would give us serious pause. With but two exceptions, however, a careful review of the evidence reveals that appellants plainly presented other evidence sufficient to shift the burden of persuasion, effectively foreclosing any realistic claim for Rule 50(b) relief by defendants. We briefly recount the dispositive evidentiary considerations bearing on each appellant's claim.

### 1. *Brenda Aponte Osorio*

Ms. Aponte was dismissed from her "regular" position, as an Executive Officer IV, in May 1985. In addition to other direct evi-

---

not controlling in the area of first amendment law," *Santiago–Negron,* 865 F.2d at 436 (emphasis added), and, in this respect, we see no principled distinction between the Commonwealth's personnel and electoral laws. Second, it is not necessarily a sufficient defense that a plaintiff did not meet the legally mandated minimum qualifications for the position *at the time of appointment. See Hiraldo–Cancel,* 925 F.2d at 13; *Santiago–Negron,* 865 F.2d at 436. Although, as a general rule, an employee's *continuing* inability to meet the established minimum qualifications

for the position can be a sufficient nondiscriminatory ground for dismissal, *cf. Hiraldo–Cancel,* 925 F.2d at 14 (*reinstatement* is a meaningless remedy where the employer, "under the aegis of valid personnel standards, is empowered to terminate reinstated employees as soon as they dust off their desks"), *Santiago–Negron*'s proscription against *post hoc* "nullification" would suggest that, to be controlling, the employee's qualifications should be measured *as of the challenged dismissal.*

dence of discriminatory animus,[6] the letter of dismissal from Mayor Aponte stated that Ms. Aponte apparently did not possess the qualifications for her position—in particular, a college degree and "considerable" relevant work experience. In fact, the written job description for an Executive Officer IV lists a college degree as "desirable preparation," but provides that a "combination of preparation and experience will be acceptable"; it defines "experience" as "positions of progressive responsibility ... in the public service, including considerable administrative or *supervision experience.*" (Emphasis added.) At trial, Ms. Aponte testified that she attended college for three years, and began working for the City in 1978 as a *supervisor* in the Human Resources Department.[7]

Ms. Aponte presented sufficient evidence to enable a jury to find that she possessed the required qualifications, *both* at the time of her appointment and dismissal. The jury could have concluded, therefore, that defendants' contemporaneous justification was a mere pretext for political discrimination. *Cf. Aponte–Santiago v. Lopez–Rivera,* 957 F.2d 40, 43 (1st Cir.1992) (reversing summary judgment for defendant; noting that proof that defendant's asserted nondiscriminatory reason for dismissal was pretextual is a "link in a chain of circumstantial evidence" of political discrimination which, when coupled with allegedly "conclusory" evidence as to the timing of demotion and the parties' political affiliation, creates a triable issue which the fact finder might resolve in plaintiff's favor); *Anthony,* 952 F.2d at 606 (plaintiff's obvious qualifications can be circumstantial evidence of discriminatory animus); *cf. also Burns v. Gadsden State Community College,* 908 F.2d 1512, 1519 (11th Cir.1990) (employer's exceedingly narrow interpretation of minimum "experience" required for position, coupled

with other evidence of discriminatory animus, creates genuine dispute as to whether employer "invented" excuse as pretext to mask improper motive for dismissal in ADEA action). The circumstantial evidence of pretext, coupled with the direct evidence of discriminatory animus, was sufficient to shift the burden of persuasion to defendants. As there was no conclusive evidence that Ms. Aponte would have been dismissed in any event for a nondiscriminatory reason, the jury verdict must be sustained.

### 2. Dorotea Collazo Rivera

Ms. Collazo was dismissed from her "regular" position, as an Administrative Assistant I, in January 1986.[8] The dismissal letter asserted that Collazo's termination was based on an absence of evidence that she was ever qualified for her position. However, Collazo's job description merely required a "desirable" (high school diploma) education/experience ("general office work") mix. Collazo testified that she met the posted academic preparation component of the job description. Moreover, there was no dispute that Collazo, who was appointed *to her final position* with the City in 1981, previously had been employed as an office clerk for the City *since 1976.* Thus, Collazo likewise succeeded in shifting the burden of persuasion to the defendants, and defendants simply failed to persuade the jury.

### 3. Maria Colon de Jesus

▪ Ms. Colon was dismissed from her "regular" position, as a Messenger, in July 1985. The letter of dismissal stated that the City's messenger service, with forty-two employees, was "excessive and unnecessary," that it must be reduced to ten employees as an economy measure, and that the ten employees to be retained had been chosen based

---

6. Ms. Aponte states that she was constructively dismissed one day after the new administration took office, when she was denied access to her office, told that she was "not a person of trust," and given no further duties. Her protests went unanswered.

7. Even though their individualized defenses, in many instances, succumbed to this same "equivalency" virus, permitting the jury to make reasonable substitutions of work experience for edu-

cational background, defendants have not challenged these substitutions on appeal.

8. When the new administration took over, Collazo's secretary was transferred to another department and Collazo was locked out of her office without warning. Collazo's husband, who was a NPP unit chairman, and her daughter, were also dismissed from their positions with the City in 1985–86.

on an evaluation of their job performance and seniority.

Ms. Colon conceded that the reduction in force did occur as defendants indicated, and that she lacked the requisite seniority to qualify for one of the ten remaining positions. She points to no particular discriminatory conduct, nor does she contend that (1) messengers with less seniority or lower performance ratings were retained,[9] (2) the City needed more than ten messengers in 1985, or (3) defendants replaced any of the thirty-two dismissed messengers. As Colon's political affiliation and the timing of her dismissal were the only significant probative evidence supporting her claim,[10] and there was no direct or circumstantial evidence of pretext, the burden of persuasion never shifted to defendants. As no factual dispute was generated concerning the legitimacy of the austerity measures, or Colon's failure to meet the criteria for retention, the verdict could only have been based on conjecture that Colon would not have been terminated but for her political affiliation. *See Ferrer,* 914 F.2d at 311 ("plaintiff is not entitled to inferences based on speculation and conjecture").[11]

### 4. *Hector L. Encarnacion Matos*

Encarnacion was dismissed from his "regular" position, as a Computer Operator I, in August 1985. The dismissal letter stated that he lacked the minimum qualifications for the position, which defendants characterized at trial and on appeal as requiring an "associate degree" in accounting or computer operation. The job description called for a "high school diploma, supplemented by courses in mechanized accounting or programming and one year of experience in that field," *or* "[a] combination of academic background and experience." Thus, contrary to defendants' mischaracterization at trial, the job description did not require post-secondary school courses sufficient to qualify Encarnacion for an associate degree. Moreover, although Encarnacion conceded at trial that his post-secondary school courses were not in accounting or programming, and that he had no experience in computer programming *prior to his appointment,* he had acquired two years' working experience on the job before he was dismissed in 1985, during which time he had received several "excellent" job performance evaluations. *See id.* at 312–13 (noting that jury could credit circumstantial evidence that plaintiff "performed her duties very well"); *Estrada–Izquierdo,* 850 F.2d at 14 (finding "probative" the circumstantial evidence that plaintiff "successfully carried out her job" for many years). Encarnacion's job description was flexible enough to permit the jury to determine that he possessed the necessary qualifications, and that the stated reason for his dismissal was pretextual.

**9.** While conceding that she was among the dismissed messengers with the *least* seniority, Colon nonetheless argues that the selection criteria were suspect because Commonwealth law requires that reductions in force be justified first on the basis of employee performance ratings, and only then on seniority considerations. *See Delbrey v. Municipio de Carolina,* 111 P.R.R. 492 (1984). The record indicates, however, that defendants made their selections only after "considering the criteria of *efficiency* in the performance of messenger duties and the time of services rendered in that capacity." (Emphasis added.)

**10.** In view of Colon's concession that she lacked the requisite seniority, the other circumstantial evidence was altogether too weak to vault the initial *Mt. Healthy* hurdle. Colon's political participation was much less frequent and activist than most other appellants. According to her undisputed testimony, she merely participated "at the polling places, and on the marches in [her] spare time," and served as "secretary for the electoral board" in 1984.

**11.** There are important public policy considerations at stake in these circumstances. First, legitimate efforts by newly-elected officials to impose fiscal constraints and to foster operating efficiencies should not be hamstrung. *See Marin–Piazza v. Aponte–Roque,* 873 F.2d 432, 434 (1st Cir.1989) ("[W]e are inclined to give a certain amount of leeway to personnel decisions of new administration officials which implement a facially politically neutral reorganization of structure or procedure."). Newly-elected officials, however well meaning, might be deterred from needed measures to effect economies and efficiencies in governmental operations if a discharged employee's political affiliation alone were enough to carry her claim to the jury. Second, though there was ample opportunity to raise a genuine factual dispute regarding the legitimacy of the defendants' "austerity" program, the defendants demonstrated, *without rebuttal,* that the City has operated for at least six years with a vastly streamlined messenger staff.

### 5. *Maria de Lourdes Escute–Levest*

Ms. Escute–Levest was dismissed from her "regular" position, as a Computer Operator I, in October 1985. Initially, defendants contended that she was unqualified, but later retreated to their "nullity of appointment" justification when she protested that she had an associate degree in computer programming. *See supra* note 5. Escute, a member of the former mayor's "advance team," testified at trial—without objection as to the basis of her knowledge [12]—that her position was refilled following her dismissal, suggesting that it was not as expendable as defendants contend on appeal. The cumulative circumstantial evidence of discriminatory animus and pretext was sufficient to shift the burden of persuasion to defendants and to support the jury verdict.

### 6. *Jesus Garcia Delgado*

Garcia was dismissed from his "regular" position, as a Computer Operator I, in November 1985. Defendants contended that Garcia, who possessed an associate degree in computer programming, did not have the required year of experience in a "related field" at the time he was appointed in 1978. Even so, he had accumulated seven years' experience by the time he was dismissed, and plainly met all qualifications for the position long before his dismissal. As the jury could have inferred that the justification offered for the dismissal was pretextual, there was enough evidence to shift the burden of persuasion to defendants.

### 7. *Victor M. Guadalupe Bobonis*

Guadalupe was dismissed for the second time from his "transitory" position, as a municipal guard, in October 1985. In January 1985, the occasion of the first dismissal, the only justifications defendants offered were that his transitory appointment had already lapsed and the position was deemed expendable under the "austerity" program. Mayor Aponte abruptly rescinded the first dismissal

letter on January 25, 1985. In June 1985, however, Aponte sent another letter of dismissal, asserting that Guadalupe did not meet the minimum qualifications for the position, and that his original appointment therefore had been illegal. As there was no evidence that Guadalupe did not meet the minimum job qualifications, the jury reasonably could have concluded that defendants' shifting justifications for Guadalupe's dismissal amounted to pretextual posturing.

Furthermore, Guadalupe testified that twelve or fifteen more policemen were hired after his dismissal. *See Nereida–Gonzalez,* 990 F.2d at 706 (noting that evidence suggesting that defendants' reorganization was a "sham" may be considered probative of discriminatory animus); *Ferrer,* 914 F.2d at 311 ("overstaffing" defense undermined by competent evidence from which jury could conclude that defendants later hired replacements to perform same functions entailed by plaintiff's position); *see also supra* note 12.

### 8. *Ada N. Perez Colon*

Ms. Perez was dismissed from her "regular" position, as an Executive Officer I, in September 1985. Defendants contended that she was not qualified, and alleged that she had taken an unauthorized medical leave, without pay, to undergo surgery. The Executive Officer I position requires a four-year college degree and administrative or supervisory experience, or an "equivalent combination of academic background and experience." Perez, who was a member of the former mayor's "advance team," had attended college for two years, and had worked for the City *since 1980* as an officer for the CETA program and a coordinator at the Human Resources Department. Thus, the jury reasonably could have determined that her five-year City work experience was sufficient to offset the two-year deficit in education. *See supra* note 7. The jury there-

---

12. At oral argument, defendants contended that plaintiffs' trial testimony regarding their replacements was too conclusory and lacked factual foundation. However, at trial the defense did not object to plaintiffs' testimony based on lack of foundation. Thus, the jury was entitled to resolve these issues on the basis of its credibility determinations and weighing of the evidence. As the evidence was not challenged at trial, and there has been no showing of "plain error," *Doty v. Sewall,* 908 F.2d 1053, 1057 (1st Cir.1990), we reject their claim on appeal.

fore was free to conclude that both justifications for her dismissal were pretextual.

### 9. *Evelyn Quinones Osorio*

Ms. Quinones was dismissed from her "regular" position, as an Executive Secretary III, in September 1985. Within two weeks after taking office, Mayor Aponte called all mayor's office employees together and advised that they were "persons who were in trust to the former mayor," and that they would be replaced or transferred in "due time." Defendant Martinez also told Quinones, a member of the former mayor's "advance team," that she "didn't have his trust." After training her replacement, Quinones accepted a transfer out of the mayor's office. She testified that officials of the new administration erased her time cards and, on one occasion, retained her paycheck for six weeks. Defendant Martinez, City personnel officer, told Quinones: "[T]hose are injustices *but I follow orders from above.*" (Emphasis added.)

In July 1985, after Quinones' brief tenure in the new secretarial position, Aponte notified her that she would be terminated because she was unqualified for the position. The relevant job description called for a two-year secretarial course, and four years' secretarial experience, but two years of work experience could be substituted for educational experience. When Quinones provided satisfactory documentation of her educational qualifications, defendants fell back on their "nullity of appointment" defense as the sole ground for her September 1985 dismissal. *See supra* note 5. Moreover, Osario testified that she had worked as a secretary since 1980, and her final year as an Executive Secretary III clearly qualified her for her new position. Thus, Quinones presented sufficient direct and circumstantial evidence of discriminatory animus and pretext to shift the burden of persuasion.

### 10. *Carmen Rivera Guadalupe*

Ms. Rivera Guadalupe was dismissed from her "transitory" positions, as Child Care worker and Secretary, in January 1986. She was notified that she was being terminated because her transitory appointment had lapsed, and the City could no longer afford to fund the position. Her husband continued to work for the Aponte administration for another five or six years. Like plaintiff Colon, Ms. Rivera offered no evidence that the elimination of her position was in any way pretextual, nor that she was ever replaced, let alone by a PDP member. As political affiliation and the timing of the dismissal were insufficient to satisfy her threshold burden of production,[13] the jury verdict must be set aside as conjectural.

### 11. *Luisa Rivera Serrano*

Ms. Rivera Serrano was dismissed from her "transitory" position, as a Clerk I, in August 1985, ostensibly because her fixed term of employment had expired. Although the jury reasonably could have inferred that her position, like that of Ms. Rivera Guadalupe, would be eliminated on austerity grounds, the implicit rationale for her dismissal was undermined by Ms. Rivera Serrano's testimony that she was replaced by Rosa Mattos, a PDP member. Defendants' attempt to undermine Rivera's testimony, by noting that she previously had identified a different person (Inez) as her replacement, fails. Not only are we precluded from credibility determinations, *see Hendricks & Assocs.*, 923 F.2d at 214, but Rivera offered a plausible explanation for her inconsistent responses: both individuals applied for her former position. As there was ample basis for a reasonable inference that the proffered ground for the dismissal was pretextual, the jury verdict must be upheld.

### CONCLUSION

We acknowledge the careful attention the district court has given the evidence in this case.[14] In the Rule 50(b) con-

---

**13.** Like Ms. Colon, *see supra* text accompanying notes 9–11, Ms. Rivera's NPP activities were peripheral and relatively inconspicuous. She served as a polling unit officer for the NPP, and

chaired the NPP Womens' Movement at her local union.

**14.** In February 1992, the district court denied defendants' first Rule 50(b) motion. After care-

text, however, we are required to recognize that evidence does not pass through the jury "lens" unrefracted. Our review convinces us that these jury verdicts, with two exceptions, must therefore be reinstated.[15]

*Judgment in accordance with the verdicts must be reinstated for all appellants, with the exception of Maria Colon de Jesus and Carmen Rivera Guadalupe. In all other respects, the district court judgment is affirmed. The case is remanded to the district court for further proceedings not inconsistent herewith. Costs are awarded to the nine prevailing appellants.*

fully reviewing its "notes, defense arguments and the jury verdicts," the court based its ruling on the fact that "the jury individually and meticulously considered each [of the 255] claim[s]." The closeness of these questions is demonstrated by the district court's equally painstaking reconsideration, as well as our own review.

We nevertheless reject plaintiffs' appeals from the district court ruling denying their reinstatement. A denial of reinstatement is reviewed for "abuse of discretion," *Hiraldo–Cancel*, 925 F.2d at 13, and we will reverse "only if we are left with a firm conviction that [the district court] has committed 'a meaningful error in judgment.'" *Rosario–Torres v. Hernandez–Colon*, 889 F.2d 314, 323 (1st Cir.1989) (en banc) (quoting *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 923 (1st Cir.1988)). It did not. After assiduously weighing the equities, the district court rejected the reinstatement claims on several sustainable grounds. First, federally compelled reinstatements to municipal positions implicate serious comity and federalism concerns, especially in light of the compelling evidence that plaintiffs' appointments were made in blatant disregard of Commonwealth and municipal personnel and electoral laws, and that the City was operating under severe fiscal constraints, both at the time of the dismissals. *Id.* (noting that, "[i]n shaping equitable remedies, comity concerns can loom large," and that "court-ordered reinstatement of illegally-hired ... workers strikes a particularly jarring note"). Second, significant periods of time elapsed after their dismissals before plaintiffs requested injunctive relief. *Id.* at 324. Finally, some of the harshness inherent in a refusal to reinstate is diminished where the employee has been awarded significant monetary relief. *See Rosario–Torres*, 889 F.2d at 322, 324 (contrasting Title VII cases, which do not permit recovery of compensatory or punitive damages, with First Amendment political discrimination cases, which offer a fuller "palette of available make-whole remedies" to offset a denial of reinstatement).

**15.** Aponte also asserts that the verdicts should be vacated as inconsistent, since the special verdict did not label Aponte "liable" for political discrimination and yet found him liable for punitive damages. We reject this contention. A facially inconsistent verdict in a civil action—no rare phenomenon—is not an automatic ground for vacating the verdict. *See Fairmount Glass Works v. Cub Fork Coal Co.*, 287 U.S. 474, 485, 53 S.Ct. 252, 255–56, 77 L.Ed. 439 (1933). The court "must attempt to reconcile the jury's findings, by exegesis if necessary ... before [it is] free to disregard [them]." *Gallick v. Baltimore & Ohio R. Co.*, 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618 (1963).

Here, the findings are readily reconcilable. The jury charge, to which there was no relevant objection, suggested that Aponte's liability and the municipality's liability could go hand in hand. Since the special verdict form did not specify the need for dual findings on liability, the jury may have reasoned that branding the City "liable" necessarily incorporated a finding of Aponte's liability as well. Accordingly, in view of the jury's clear imposition of liability for punitive damages on Aponte, we cannot conclude that the verdict—naming only the City "liable" for discrimination—unambiguously or completely exonerated Aponte. *Compare DeFeliciano v. DeJesus*, 873 F.2d 447, 452 (1st Cir.) (citing cases in which employee was completely exonerated, but employer, whose liability could only derive from employee's liability, was found liable), *cert. denied*, 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 107 (1989).