

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-12-1997

# Stephens v. Kerrigan

Precedential or Non-Precedential:

Docket 96-1469

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Stephens v. Kerrigan" (1997). *1997 Decisions.* Paper 189.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/189

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

iled August 12, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-1469

JAMES STEPHENS; ANTHONY LONGO; DAVID MOYER

v.

GLENN S. KERRIGAN; WILLIAM H. HEYDT;
THE CITY OF ALLENTOWN
(D.C. Civil No. 95-cv-00615)

JOSEPH HANNA; MARK VITALOS

v.

GLENN S. KERRIGAN; WILLIAM H. HEYDT;
THE CITY OF ALLENTOWN
(D.C. Civil No. 95-cv-08093)

James Stephens, Anthony Longo, David Moyer,
Joseph Hanna and Mark Vitalos,

Appellants

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 95-cv-00615)

Argued January 16, 1997

Before: SLOVITER, Chief Judge,
SCIRICA and SEITZ, Circuit Judges

(Opinion filed August 12, 1997)

Fredrick E. Charles (Argued)
Allentown, PA 18102

Edward R. Eidelman (Argued)
Allentown, PA 18102

 Attorneys for Appellants

David M. Green
Harrisburg, PA 17108

Edward H. Feege (Argued)
Jeffrey M. Zimskind
Lehigh Valley, PA 18002

James L. McAneny (Argued)
Harrisburg, PA 17108

 Attorneys for Appellees

**OPINION OF THE COURT**

SLOVITER, <u>Chief Judge</u>.

Appellants, five police officers for the City of Allentown, filed this action asserting that they were denied promotions because they openly opposed or failed to support the candidacy of William Heydt for mayor of Allentown and/or supported his rival, John Pressman. The officers charged that the City, Mayor Heydt, and Officer Glenn Kerrigan, president of the Fraternal Order of Police, who was a Heydt supporter, deprived them of their First Amendment rights in violation of 42 U.S.C. § 1983 and 42 U.S.C.§ 1985(3). They also alleged that Kerrigan individually breached his duty of fair representation and that Mayor Heydt violated their First Amendment rights to petition for redress of grievances by denying them access to the courts.

As in most cases involving a contested employment action in which the district court granted summary judgment for the defendants, we must focus on whether the plaintiffs adduced sufficient evidence to permit the fact

finder to draw the inference that the employment action was motivated by an impermissible consideration. If so, plaintiffs have established the genuine issue of material fact that precludes summary judgment unless the evidence shows the challenged action would have been taken in any event. To make that decision, we must review the facts adduced in detail.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

The candidates for mayor of the City of Allentown in the 1993 election were Democrat John Pressman and Republican William Heydt. Chief of Police Wayne Stephens was a Pressman supporter, as were a number of high-ranking police officials. Glenn Kerrigan, who had been president of the Fraternal Order of Police (the"FOP") since 1992, was a Heydt supporter, as were a number of other police officers, including Richard Suppan, Gerald Dieter and James Bowser who were all union officers or members of the union negotiating committee. The FOP is the recognized bargaining agent for the police, albeit not for certain high ranking officials. There is some evidence that the relationship between the FOP leadership and the Chief of Police and his immediate advisors was somewhat rancorous: the FOP officers believed that Chief Stephens was antagonistic towards them on account of their union activities and the police administration did not approve of the union's attempts to "run" the Department.

**FOP Endorsement**

The Preamble of the FOP's Constitution and Bylaws states that the FOP is "strictly non-political." App. at 269. The parties differ as to whether that precludes the FOP from endorsing a candidate. Much of the evidence centers on the endorsement, later rescinded, of candidate Heydt and the part that issue played in Heydt's decision not to promote the plaintiffs.

During the primary election, candidate Heydt visited Chief Stephens in an effort, according to Stephens, to gain

the Department's endorsement. Stephens declined, testifying later that he did not believe the Department should make endorsements. He also testified that he was a vocal Pressman supporter in the Department and among neighbors and friends. Subsequently, Heydt criticized the management of the Police Department on a number of grounds and his remarks were reported in an Allentown newspaper. Plaintiffs allege that FOP leaders, including Kerrigan, were providing Heydt with information concerning the administration of the Police Department.

On September 7, 1993, candidates Pressman and Heydt made brief statements at the FOP's regular monthly meeting. James Bowser moved to endorse Heydt's candidacy, but the vote resulted in a 16-16 tie. Kerrigan, who was presiding, declined to cast the tie-breaking vote. A motion was passed that no endorsements be made until after the candidates' forum, which could be attended by all members of the FOP. This forum was held on September 28, 1993. Officer Fulmer, also a Heydt supporter, had circulated a petition requesting a special meeting of the FOP to be called the next day, September 29, in order to endorse a candidate.

The manner in which the September 29 meeting was called and publicized is another matter of dispute. Kerrigan contends that he was mandated by the Bylaws to call a special meeting upon receipt of a request signed by ten members. Plaintiffs allege that it was unusual for a special meeting to be called the day after the candidates' forum, particularly because there was a regular monthly meeting scheduled for the next week. A number of officers later complained that the September 29 meeting was not adequately publicized to the FOP membership.

Candidate Heydt was endorsed by the FOP membership at the special meeting held on September 29 by a vote of 36 to 2 with 4 abstentions. Most of Officer Fulmer's platoon attended the meeting; many of the FOP members who had attended the September 7 meeting did not.

The regularly scheduled FOP meeting on October 5 was contentious, with some members, including a Heydt friend and presumably supporter, expressing reservations

4

concerning the FOP's endorsement policy. By a vote of 44 to 12, the endorsement of candidate Heydt was rescinded. What was said and by whom at this meeting is one of the bases for the plaintiffs' claim that their failure to support Heydt led to their non-promotion. Heydt was elected Mayor of Allentown on November 2, 1993, and took office on January 3, 1994.

**Promotion Lists**

In 1992, before the events at issue here, when Joseph Daddona was Mayor of Allentown, the FOP, headed by Kerrigan, and the Allentown Police Department, with Wayne Stephens as the Chief of Police, negotiated a new promotion procedure for the positions of patrol sergeant, investigative sergeant, patrol lieutenant and investigative lieutenant. This was codified as General Order 309 of the Allentown Police Department. This new promotion procedure was followed in 1993 to produce promotion lists for the above positions. The agreed-upon procedure does not entail objective tests but provides that promotion lists are compiled following an evaluation by a five-person committee including the Chief of Police, the Assistant Chief of Police, the Deputy Assistant Chief of Police, one Captain, and the candidate-officer's primary supervisor. A candidate's placement on the list is based upon these "oral interview/ evaluation" scores, which account for eighty percent of the total score, and seniority, which accounts for twenty percent. Promotions could be made from the top three names on the list, with the Chief of Police able to pass over any particular candidate only twice. If three positions opened, the top three candidates had to be chosen. However, if only one position was to be filled, the first two candidates could be skipped twice. After that, any subsequent open positions would have to be filled by the skipped candidates.

The lists were officially publicized on November 1, 1993, just prior to the mayoral elections held that week. The five plaintiffs ranked highly. James Stephens rankedfirst for investigative lieutenant and first for patrol lieutenant; Hanna ranked third for investigative lieutenant and fourth for patrol lieutenant; Vitalos ranked first for investigative sergeant and second for patrol sergeant; Longo ranked

third for patrol sergeant and fourth for investigative sergeant; Moyer ranked third for investigative sergeant.

In contrast, the policemen who were in the FOP leadership scored near the bottom of the sergeants lists. Kerrigan ranked twenty-eighth on both the investigative and patrol sergeants lists; Suppan ranked thirty-first for investigative sergeant and thirtieth for patrol sergeant, Dieter ranked thirty-third on both lists, and Bowser ranked thirty-fourth on both lists. None were ranked on the lieutenants lists. We were advised by counsel at argument that there were sufficient openings so that each of the top three candidates would have been promoted.

### Police Chief Interviews

Immediately following his election, Mayor Heydt met with Chief Stephens and informed him that he would not rehire Stephens as Police Chief. According to Stephens, Heydt also accused him of manipulating the promotion lists to arrange for Angel Santos, an Hispanic officer, to placefirst on the patrol sergeants list and second on the investigative sergeants list in order to accommodate candidate Pressman's promises to promote more Hispanics within the Police Department. Stephens also alleges that Heydt accused him of nepotism in regards to his brother James Stephens' position on the lists and that Heydt harangued him on the operation of the department in general, specifically criticizing a number of the Captains.

In December 1993, Heydt interviewed Assistant Chief Monahan, Captains Mitchell, Berndt, Manescu and Bennis, and John Stefanik, a retired former Captain in the department, for the Chief of Police position. Ultimately, Heydt selected John Stefanik as the new Chief of Police. Stefanik had been a Heydt supporter and had worked at a polling place for Mayor Heydt during the election.

### Unfair Labor Practices Challenge

On December 20, 1993, the FOP filed an Unfair Labor Practice ("ULP") charge with the Pennsylvania Labor Relations Board (the "PLRB"), claiming that the sergeants promotion lists were invalid because anti-union animus on part of the evaluators resulted in artificially depressed

6

scores for Kerrigan, Kulp, Suppan, Bowser, and Dieter, five officers who held union positions or were members of the union's collective bargaining committee.

Seven officers including Angel Santos and four of the five plaintiffs here attempted to intervene in the PLRB complaint on the ground that the action was not supported by the general membership of the FOP and was detrimental to them. Their request to intervene was denied.

While the PLRB complaint was pending, no promotions were made, either from the sergeants lists which were at issue in the Unfair Labor Practice charge or from the lieutenants lists even though those lists had not been challenged. Mayor Heydt stated in his deposition that he did not want to make sergeant promotions in light of the PLRB complaint. He also stated that he did not want to make lieutenant promotions because he thought that James Stephens' name was at the top of the lists because of nepotism, and because of an unrelated state court action brought by captains and lieutenants against the City of Allentown charging that the City had failed to comply with Pennsylvania's Wage Payment and Collection Act ("Act 204") regarding wages for managerial-level police officers. The Act 204 suit was filed in state court in October 1994, and Mayor Heydt has testified that he did not want to promote anyone to lieutenant in order to avoid increasing the number of plaintiffs joining in the suit.

On September 21, 1995, a little less than two years after the ULP complaint was filed, the PLRB hearing examiner issued a proposed order invalidating the 1994-95 promotion lists for investigative sergeants and patrol sergeants, and ordered the City to refrain from making promotions until a new list was developed. The hearing examiner found that Chief Stephens and his immediate deputies gave some scores of lower than 4 in violation of the applicable procedure. The examiner also found that the scores given by Chief Stephens and his immediate deputies to Kerrigan, Dieter and Suppan were tainted by anti-union animus, though not those of Kulp or Bowser. The PLRB adopted the hearing examiner's findings and conclusions, except as to Dieter, and issued a Final Order dated October 8, 1996, directing the City to void the 1994-95 promotion

7

lists and to refrain from making promotions to sergeant until a new list was developed. The City and the FOP cross-appealed in the Commonwealth Court of Pennsylvania and, in a memorandum opinion, the court dismissed the appeals as moot because the promotion lists had expired by operation of law at the end of 1995. See City of Allentown v. Pennsylvania Labor Relations Bd., No. 3027 C.D. 1996, slip op. at 5-6 (Pa. Commw. Ct. May 23, 1997).

Following the invalidation of the sergeants promotion lists, the City has not promoted to the ranks of either lieutenant or sergeant as of the time of oral argument before us.

## **The Instant Action**

The first complaint in this consolidated action was filed by James Stephens, Anthony Longo and David Moyer in January 1995. They sued Mayor Heydt, the City of Allentown, and Glenn Kerrigan, and alleged a conspiracy in violation of 42 U.S.C. §§ 1983 and 1985(3) to deny them promotion because of their political affiliation. They also asserted pendent state law claims against Kerrigan. In December 1995, Joseph Hanna and Mark Vitalos filed a complaint raising the same claims, but they added a count for Mayor Heydt's "illegal attempt to deny access to the courts to other[s] eligible to be promoted to lieutenant." App. at 134. They based this claim on Heydt's testimony that he did not want to promote more officers who could become plaintiffs in the Act 204 lawsuit against him and the City. Stephens, Longo and Moyer sought leave to amend their complaint to add this count.

Following discovery, the district court granted the defendants' motions for summary judgment on the §§ 1983 and 1985(3) claims in favor of all three defendants, dismissed plaintiffs' breach of fair representation and state constitutional claims, and denied the motion of Stephens, Longo, and Moyer to amend their complaints after determining that the access to the court's claim failed to state a cause of action. Plaintiffs do not contest the district court's dismissal of the breach of fair representation and state constitutional claims, but argue on appeal that the district court improperly granted summary judgment to the

8

defendants on their §§ 1983 and 1985(3) claims. Hanna and Vitalos argue that the district court erred in dismissing their right to access claim, and Stephens, Longo and Moyer contest the district court's denial of their motion to amend.

**II.**

**DISCUSSION**

**A.**

**Applicable Legal Principles**

In <u>Elrod v. Burns</u>, 427 U.S. 347, 372-73 (1976), and again in <u>Branti v. Finkel</u>, 445 U.S. 507, 514-15 (1980), the Supreme Court held that it is unconstitutional for public agencies to discharge employees who are neither policymaking nor advisory based on their political affiliations, reasoning that an employee's exercise of First Amendment rights outweighs the government's interest in maintaining a system of political patronage. The Court expanded upon <u>Elrod</u> and <u>Branti</u> in <u>Rutan v. Republican Party of Illinois</u>, 497 U.S. 62, 75 (1990), where it held that promotions, transfers, recalls, and other hiring decisions involving public employees may not be based on party affiliation and support unless the government can show that party affiliation is an appropriate requirement for the position involved. Moreover, as <u>Elrod</u>–<u>Branti</u> teaches, "[a] citizen's right not to support a candidate is every bit as protected as his right to support one." <u>Bennis v. Gable</u>, 823 F.2d 723, 731 (3d Cir. 1987). Thus, <u>Rutan</u> encompasses claims of political discrimination when an employer takes an adverse employment action because s/he does not want to fill employment positions that would otherwise be available to his or her supporters. See <u>Rutan</u> , 497 U.S. at 67-68; <u>Bennis</u>, 823 F.2d at 731.

A political discrimination case employs similar, though not identical, burden-shifting mechanisms as those used in other employment discrimination contexts, such as Title VII cases. See <u>Acevedo-Diaz v. Aponte</u>, 1 F.3d 62, 66 (1st Cir.

9

1993). To make out a prima facie case, public employees who claim that they suffered from an adverse employment action based on their exercise of a constitutional right must show that they worked for a public agency in a position that does not require a political affiliation, that they were engaged in constitutionally protected conduct, and that the conduct was a substantial or motivating factor in the government's employment decision. See Robertson v. Fiore, 62 F.3d 596, 599 (3d Cir. 1995); Rode v. Dellarciprete, 845 F.2d 1195, 1200 (3d Cir. 1988); Laskaris v. Thornburgh, 733 F.2d 260, 265 (3d Cir.), cert. denied, 469 U.S. 886 (1984). Once the employee makes this demonstration, the employer may avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Robertson, 62 F.3d at 599.

It is not disputed that the plaintiffs are public employees and that the positions of sergeant and lieutenant do not require a political affiliation. This court's review of the district court's summary judgment rulings is plenary. Summary judgment will be proper "if the pleadings, depositions, answers to interrogatories . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A court must view all facts and inferences in the light most favorable to the party opposing the motion.

**B.**

**Knowledge**

In granting summary judgment for Heydt and the City, the district court held that "[t]he plaintiffs in this case have not produced evidence sufficient to establish that Mayor Heydt knew their political affiliations" and that "[t]he plaintiffs have not presented any direct evidence that Mayor Heydt refused to promote the plaintiffs in order to leave room for his own political supporters." Dist. Ct. Op. at 5, 8.

10

Heydt states in his sworn affidavit and in his deposition testimony that he did not know the plaintiffs' political affiliations or whether they opposed or supported his candidacy for mayor. He notes that only James Stephens spoke publicly against his endorsement at the October 5 FOP meeting – a meeting that Heydt did not attend– and that plaintiffs Longo, Moyer, Hanna, and Vitalos never publicly expressed support for or opposition to either candidate. Plaintiffs assert that it was well-known among their co-workers that they supported Pressman and opposed Heydt's endorsement. They argue that it is reasonable to infer that Heydt also knew this information because Heydt's FOP supporters knew the identities of the officers who opposed Heydt's endorsement and these supporters had a close political relationship with Heydt and advised Heydt on personnel matters before and after his election.

The district court declined to draw any inferences favorable to the plaintiffs from the record evidence, citing Geraci v. Moody-Tottrup, Int'l., Inc., 82 F.3d 578 (3d Cir. 1996), for the proposition that "when an employerfiles declarations that he did not know of an employee's membership in a protected class, the jury may not infer such knowledge from the employee's having told other office workers of her condition." Dist. Ct. Op. at 6.

In Geraci, a Title VII case, this court upheld the district court's grant of summary judgment to the defendant-employer, holding that the employee could not prove that she was fired on account of her pregnancy because she failed to proffer any evidence that the employer knew that she was pregnant. See 82 F.3d at 597. Geraci argued that because she told six of twenty co-workers of her pregnancy, it became a common topic of discussion in the office and therefore her managers had to have known of it when they decided to fire her. In their affidavits, the managers disclaimed knowledge and Geraci deposed only one co-worker, who testified that he did not tell management of Geraci's pregnancy. No other evidence of knowledge was offered. See id. at 582.

We do not read Geraci as holding that a jury may never infer knowledge on the part of an employer when the

11

employee proffers evidence that the information was generally known to co-workers. In Geraci, the only evidence presented was that the six knowledgeable co-workers complied with Geraci's request not to reveal her pregnancy. The court also noted that there was undisputed evidence that management had decided to lay-off Geraci before she herself knew that she was pregnant. See id. In light of those facts, we declined to remand the case based on "sheer speculation that one or more of the people she entrusted with highly personal information violated her confidence and that members of . . . management lied about their lack of knowledge." Id. (emphasis in original); cf. Clark v. Clabaugh, 20 F.3d 1290, 1299 (3d Cir. 1994) (Seitz, J., concurring in part and dissenting in part).

In this case, there is evidence that the political affiliations of the members of the Police Department constituted more than workplace rumor; the heated and contentious debate over the endorsement of Heydt for Mayor drew clear lines between those who supported Heydt and those who did not.

Joseph Hanna stated in his deposition testimony that "[t]here developed clearly two factions within the police department at this point. The Kerrigan, et al. faction, as I would describe them, were pro William Heydt. The other faction were pro Jack Pressman." App. at 429-30.

According to Assistant Chief of Police Gerald Monahan, (who is not a plaintiff) the identities of the members of each faction were widely known among the employees of the Police Department. He testified:

A. I think you kind of knew where -- what side of the fence guys were lining up on in terms of -- I don't mean to insinuate that everybody on [sic] the department is political. But at that particular time you knew which guys were kind of lining up on the Pressman side of the fence, and it was obvious after awhile who was lining up on the Heydt side of the fence.

. . .

Q. And during that political campaign of 1993, were you also aware of Mr. Kerrigan's political position vis-a-vis mayoral candidates?

12

A. I knew which side of the fence he was on, so to
speak.

Q. And that would have been?

A. He was supporting Mr. Heydt.

Q. Mr. Heydt. I take it then which side of the fence
people were on was no secret?

A. No it was not.

App. at 820-21.

The plaintiffs testified in their respective depositions that
they were vocal in their opposition to Heydt's endorsement
and that this was known throughout the Department.
James Stephens testified that after raising objections to the
September 1993 special meeting called to endorse
candidate Heydt, he was "told to sit down and shut up,
because [he] had a political agenda, by Mr. Suppan, Mr.
Fulmer and Mr. Kerrigan." App. at 780. He further stated
that at the October 5 FOP meeting, he was sitting at a table
with other individuals who opposed Heydt's endorsement,
including Moyer and Longo, and that he was "elected to go
up [to the podium] and give our views on what was going
on." App. at 783. He described the October 5 meeting as
"very volatile," noting that a number of "people [were]
standing up and yelling" including Officers Longo and
Moyer and a "number of people sitting at our table that
were quite upset." App. at 783.

Heydt argues that the mere fact that groups of opposing
political supporters existed within the department does not
support an inference that he personally knew who was in
those particular groups. He cites Laskaris v. Thornburgh,
733 F.2d 260, 265 (3d Cir.), cert. denied, 469 U.S. 886
(1984), a case in which plaintiffs, employees of the
Pennsylvania Department of Transportation, claimed that
they were fired because they were Democrats. The only
evidence offered by the plaintiffs was a letter from a state
representative saying that it was time to "clean-out the
political hacks" at the agency; no evidence was offered to
show that the managers of the department responded to
this letter by firing the plaintiffs or that, of the 15,000
patronage jobs that existed, theirs were specifically

13

targeted. See id. at 265-66. Nor were the plaintiffs able to
show that any of the other fifty employees who were fired
were dismissed because of their political affiliations. The
case proceeded to a bench trial and the district court found
that the plaintiffs had not adduced enough evidence to
show that the persons responsible for the plaintiffs' firing

knew that they were Democrats. We upheld the judgment, stating that although the evidence had the "vague aura of politically motivated patronage firings . . . it is far too insubstantial to show that the individual plaintiffs here were discharged because of their political affiliations." Id. at 266.

In contrast, plaintiffs here have offered circumstantial evidence showing that there was an information "pipeline" between Heydt and his FOP supporters. Significantly, Captain Mitchell, who was a neighbor and personal friend of Heydt, testified that during his interview with Mayor Heydt for the Chief of Police position, Heydt asked him why he spoke out against his endorsement at the October 5 FOP meeting, though Heydt had not been present at the meeting. Mayor Heydt also told Captain Mitchell that he knew that there was going to be litigation concerning the promotion lists. See app. at 869-70. In his own deposition, Heydt testified that he knew who his own supporters within the Department were but denied knowing who his opponents were, despite admitting that he confronted Mitchell with the fact of his disloyalty. See app. at 747-48.

There is also evidence that there was continuing contact between the FOP leadership, including Kerrigan, and Heydt concerning the management and personnel policies of the Police Department. While on its face it might seem natural to have such a relationship, plaintiffs point out that the usual channel for such communications and advice would be through the Chief of Police and his deputies, not through individual union leaders who were low ranking members of the Police Department. Indeed, there was testimony in seven depositions that the FOP leadership prepared and submitted a "master" reorganization plan for the Police Department to Heydt after his election. See app. at 448 (deposition of J. Hanna); 804 (deposition of W. Stephens); 855 (deposition of R. Manescu); 894 (deposition

14

of F. Peters); 902 (deposition of W. Berndt); 944 (deposition of T. Bennis). Heydt, in turn, submitted the plan to Chief Stefanik. Stefanik confirmed the existence of such a plan, but claimed that it was not utilized. App. at 963-64.

There is other evidence as well. Captain Berndt, who characterized the FOP leadership – Kerrigan, Fulmer, Suppan, Dieter, Smith and Bowser – as the "mayor's boys," testified as to the significance of the connection between the Mayor and the FOP leadership:

Q. In your discussions with Chief Stefanik about the influences of this group of people that you indicated as the mayor's boys, Mr. Suppan, Mr. Fulmer, Mr. Smith, Mr. Dieter, Mr. Kerrigan, and Mr. Bowser, what were Chief Stefanik's reactions? What did he say about those influences during your discussions with him?

A. Well, I think he agreed that those specific officers had an influence on the mayor or had an input to the mayor or something that caused the mayor to utilize the information received from those officers in his running of the city.

Q. Now, as I would understand, in the department the chain of command would go from any member of the police department to the chief before it would go to the mayor. Is that correct?

A. That's correct.

Q. And are you saying that in your conversations with Chief Stefanik, that there was a diversion of this chain of command in terms of somebody going to the mayor, influencing him outside of that chain of command?

A. Absolutely.

. . .

Q. Did Chief Stefanik confirm to you in words or substance that that's what he was saying, that this group of people was influencing the mayor outside of the chain of command, not going through him?

A. Absolutely.

App. at 903-04.

15

Captain Bennis and Officer Hanna expressed similar views regarding the management of the department. Bennis stated in his deposition that "[s]everal people in the FOP . . . are directing which way the department goes," including "Fulmer, Dieter, Suppan, Kerrigan, maybe Bowser, maybe Charlie Kulp; I don't know about the last two." App. at 946. Hanna recounted a conversation he had with Chief Stefanik,

at which time the chief . . . when he referred -- the chief would refer to "he" and would point back to city hall, referring to the mayor. When he referred to"they," it was my understanding he was referring to the mayor's supporters.

 My question to the chief at that time was: "You mean to tell me that there are a handful of patrolmen that have more clout with the mayor than you do as chief of police?" His answer to that was yes.

App. at 526-27.

Although evidence of a direct link between the Mayor and the FOP leadership does not necessarily show any impropriety, in the context of this case a factfinder could believe it lends credence to the plaintiffs' contention that although Heydt was not present at the October 5th meeting he was advised of the position of the participants through his line of communication with the FOP leaders, who were present. Heydt was told of Mitchell's sentiment at the meeting and a plausible inference could be drawn that the same sources informed him of the names of the other officers who were outspoken, either in opposing his candidacy or in opposing any FOP endorsement of a candidate. James Stephen spoke out and sat at the same table with some of the other plaintiffs. Of the plaintiffs, only Joseph Hanna, who was out of town, did not attend. Nonetheless, if the positions of the members of the force were as well known as some of the witnesses testified, he also may have been identified with the others. These are facts that would have to be proven, but on this record we cannot sustain the district court's grant of summary judgment which was based on lack of sufficient evidence of Heydt's knowledge of plaintiffs' political preferences or non-support to create a material issue of fact.

16

## C.

## Causation

Heydt and the City argue that mere presence on the promotion lists does not guarantee promotion, that the City is under no obligation to ever make promotions, and that because no promotions from the lists have yet been made plaintiffs have failed to plead an element of their prima facie case. This argument could be viewed analytically as one challenging the sufficiency of plaintiffs' evidence on injury, causation, or pretext. We address the preliminary question of injury first.

We have held that while an employee may have a legitimate claim of entitlement to his or her place on a promotion eligibility list that would give rise to a right to procedural due process, the employee does not have a "substantive right" in the position itself if the promotion does not automatically follow from the employee's placement on the list. Stana v. School Dist. of City of Pittsburgh, 775 F.2d 122, 125–26, 131 (3d Cir. 1985). However, plaintiffs in this case have not asserted a procedural due process claim. In a political discrimination case under the Elrod–Branti–Rutan trilogy, a plaintiff is not required to establish a property interest in the denied position, but instead must show that the employment decision was based on an impermissible motive. See Acevedo–Diaz, 1 F.3d at 68 n.5; Santiago–Negron v. Castro–Davila, 865 F.2d 431, 436 (1st Cir. 1989). Although the Mayor had no obligation to make any promotions, if the plaintiffs' political affiliation was a substantial or motivating factor in his decision not to promote them, they have established a basis for finding the requisite causation. See Robertson, 62 F.3d at 599.

Of course, a plaintiff must be able to show some realistic threshold causal connection between the injury suffered and the defendant's unlawful conduct. See Doherty v. Rutgers School of Law–Newark, 651 F.2d 893, 902 (3d Cir. 1981). In Doherty, we considered the issue in terms of the standing of an applicant to a state university law school to challenge an alleged discriminatory minority admissions

17

program. We held that Doherty did not have standing because he did not possess the qualifications to have been admitted to the school even in the absence of the admissions program he was contesting. After reviewing the Supreme Court's decision in Regents of University of California v. Bakke, 438 U.S. 265 (1978), and determining that Bakke did not "reflect an abandonment of all [the Court's] analysis of standing developed in other cases," Doherty, 651 F.2d at 902, we held that while Doherty had asserted an injury – loss of a place in the law school – he could not show that he had been injured as a result of the law school's minority admissions program, because he had no realistic chance of admission. Id. at 900–01.

Similarly, in Howard v. New Jersey Dept. of Civil Service, 667 F.2d 1099, 1101 (3d Cir. 1981), we held that plaintiffs did not have standing to challenge the physical agility test administered by the Newark Police Department as discriminatory against women because the plaintiffs had not passed the initial civil service examination that was a prerequisite for taking the physical test. Plaintiffs had suffered a distinct and palpable injury but because they were refused employment on account of their failing the written test, the physical agility test could not have caused their loss of job opportunity; therefore the benefits of the invalidation of the test could not possibly accrue to them. Id. at 1101–02.

Because these plaintiffs, unlike Doherty and Howard, are ranked within the top three places on one or more of the promotion lists, they would have been among those few officers to be considered for promotion if promotions were made. Thus, their claims do not fail for the same reasons as those that precluded the claims in Doherty and Howard.

Heydt and the City argue that although it was not the basis for the district court's decision, we may affirm on the ground that plaintiffs have not produced enough evidence from which a reasonable jury could find that plaintiffs' protected activities were a substantial or motivating factor in not making promotions from the sergeants or lieutenants lists. See Rich v. United States Lines, Inc., 596 F.2d 541, 551 (3d Cir. 1979) (affirming on ground other than that relied on by district court since parties had the opportunity

18

to present evidence and argue the issue); see also Horsey v. Mack Trucks, Inc., 882 F.2d 844, 847 n.3 (3d Cir. 1989); PAAC v. Rizzo, 502 F.2d 306, 308 n.1 (3d Cir. 1974)(citing Helvering v. Gowran, 302 U.S. 238, 245 (1937)), cert. denied, 419 U.S. 1108 (1975).

Once Heydt has articulated a nondiscriminatory reason for the employment action, here the failure to promote, plaintiffs may prevail by discrediting that proffered reason, either circumstantially or directly, or by adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or substantial cause of the adverse action. See, e.g., Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); Torre v. Casio, Inc. , 42 F.3d 825, 830 (3d Cir. 1994).

Plaintiffs vigorously challenge Heydt's proffered reasons for failing to promote. We consider the sergeants lists and the lieutenants lists separately, as the justifications offered are different.

**Sergeants Lists**

Though Heydt presents a number of reasons for failing to promote from the sergeants lists, his primary reason is the fact that the sergeants lists were the subject of an Unfair Labor Practice complaint before the Pennsylvania Labor Relations Board. Plaintiffs seek to cast doubt on this reason by claiming that Heydt was complicitous in the bringing of the ULP action and that he was a party to its inadequate defense. The only support for the former claim is Captain Bennis' testimony that Heydt had indicated to him, in his interview, that there would be litigation over the lists. However, Bennis was not sure of the date of his interview with Heydt and thus cannot be sure if the PLRB charge had been filed yet or not. See app. at 940–43.

Even if Heydt knew of the filing of the charge, plaintiffs have not produced evidence to support their contention that he was complicitous in failing to defend the charge adequately. Their sole evidence for that fact is the testimony of two police officers that the Assistant City Solicitor defending the department, Patricia Siemiontkowski, was not being aggressive enough at the hearing and that she failed to give former Chief Stephens

19

notice of the hearing so that he could be called to testify. The plaintiffs have not shown that Mayor Heydt influenced the City Solicitor's Office to choose Siemiontkowski to defend the action, nor did they show that her performance was inadequate. In fact, one of the officers who commented about Siemiontkowski's lack of expertise testified at deposition that he was satisfied with her representation of the City and did not believe the City's defense was a "sham." App. at 829, 834 (deposition of G. Monahan). More significantly, there is no evidence that Heydt tried to influence the proceedings in any way. Although plaintiffs complain that Siemiontkowski failed to contact Chief Stephens to testify, she stated that she attempted to contact Chief Stephens repeatedly but that he was unable to attend because he had booked clients for his hunting lodge on the date of the hearing. App. at 1006.

Plaintiffs do provide the testimony of Captain Peters who was told by Heydt while the City was defending the sergeants lists that "somebody better do something about that list because I guarantee you nobody will get promoted off of it." App. at 895. Plaintiffs would have us read that statement as indicating an impermissible motive, but it is equally as consistent with Heydt's claim that he would not promote from the lists while they were subject to the ULP complaint.

It is undisputed that the ULP charge was filed before Heydt actually assumed his position as Mayor and that the PLRB concluded that the sergeants lists were tainted and directed the City not to use those lists as the basis of promotion. The decision of the PLRB thus substantiates Heydt's reluctance to promote from the sergeants lists.

Plaintiffs Vitalos, Longo, and Moyer were in the top tier of three on one or both of the sergeants lists. Their claim of a constitutional violation is limited to the time prior to the PLRB's decision, when Heydt had the option to promote them. Even if Heydt's reluctance to promote was colored by his view that they had been in an opposite political camp during the election, we believe that a reasonable jury could not have attributed their lack of promotion to that basis when the sergeants lists, which had been under attack,

20

were thereafter invalidated. Thus summary judgment on their claims was justified.

## Lieutenants Lists

Heydt's failure to promote from the lieutenants lists stands on a different footing because the lieutenants lists were not subject to an ultimately successful ULP action before the PLRB. Heydt has never clarified his reasons for not making promotions from the lieutenants lists, on which plaintiffs James Stephens and Joseph Hanna were among the top three. Plaintiffs have pointed to a number of inconsistencies in Heydt's statements to show that his reasons were pretextual and which a trier of fact could credit in concluding that Heydt was motivated by politically discriminatory criteria. Plaintiffs need not discredit each proffered reason individually. If plaintiffs cast substantial doubt on a fair number of Heydt's reasons, they will survive summary judgment. See Fuentes, 32 F.3d at 764 n.7. Heydt first argues that he had campaigned on a platform of reducing the top brass in the Police Department and therefore sought to reduce the number of lieutenants. However, this is belied by the testimony of Chief Stefanik, who indicated in his deposition that any reduction in management-level officers would probably come from attrition and not from limiting promotions. App. at 959. At best, Stefanik's testimony is ambiguous; it is not clear that a reduction in top brass was a leading Heydt priority, nor that such reduction would come from not making promotions.

Heydt relies more strongly on the claim that he did not want to add more plaintiffs to the Act 204 wage suit against him and the City by promoting officers into management positions. Indeed, this was the basis for the claim of Hanna and Vitalos alleging that by failing to promote them on this ground Heydt interfered with their First Amendment right to petition for redress of grievances. Although we do not disagree with the district court that this is not the type of action that gives rise to an action for denial of access to the courts, a fact finder could reasonably find that this justification was pretextual.

The Act 204 lawsuit brought by the lieutenants and captains was not cited in Heydt's affidavit as a reason for

failing to promote from the lieutenants lists. It only surfaced when, at his deposition, Heydt mentioned it as an additional factor in his decision-making. However, plaintiffs offer evidence that prior to that lawsuit Heydt had already decided not to promote from the lieutenants lists for the two years the lists would be operative because James Stephens, Chief Stephens' brother, was on the top of the lists. See app. at 942 (deposition of T. Bennis). The testimony that new promotion lists were being prepared by the FOP to be submitted in a master plan to the Mayor, see app. at 855 (deposition of R. Manescu), also could show that Heydt sought to exclude these plaintiffs.

There is evidence that Heydt's real concern was that James Stephens was first on the lists; he claimed that the lists were a product of nepotism. However, Heydt has not substantiated this charge, and it appears that Heydt made it inconsistently. In his affidavit, Heydt condemned all the promotion lists as being based on "nepotism and friendship with the former Police Chief." App. at 969. But during his deposition testimony, when questioned concerning his reasons for failing to promote from the lieutenants lists, Heydt stated that his only problem with the lists was "that Jim Stephens was at the top of both lists," and that no other officers owed their ranking on the lists to favoritism. App. at 741-42.

Heydt's charge that all the lists were tainted by favoritism could be viewed as a post-hoc justification to prevent appointment of Stephens, who was the most vocal opponent of Heydt's endorsement and whose familial relationship to the Chief of Police was well known. Significantly, Heydt's disinclination to promote Stephens may have adversely affected Hanna, the only other plaintiff high enough on the lieutenants list to have a realistic possibility for promotion. Captain Monahan testified that Hanna's name came up in discussions with Heydt, and that Monahan tried to convey to the Mayor that "he really needs to look at [Hanna] on his own and formulate his own opinion." App. at 826. Monahan stated that he was concerned that certain officers were "getting painted with the [Chief] Wayne Stephens' brush." App. at 827. At oral argument, we were advised that Hanna is currently serving

22

as an acting lieutenant, a fact that also seems to cut against Heydt's justification based on favoritism.

Heydt has never claimed that the individuals at the top of any of the lists are unqualified for the positions, nor is there any evidence in the record that would indicate that the officers who were top ranked on the lists were undeserving. In fact, Captain Manescu testified that he told Heydt that he did not have a problem with any of the officers to be promoted from the lists. App. at 846. This was echoed by other Captains interviewed for the Chief of Police position. See app. at 826-27 (deposition of G. Monahan); app. at 942 (deposition of T. Bennis). Significantly, Chief Stefanik acknowledged that he "probably would" promote from both lists if it were not for the PLRB decision invalidating the sergeants lists. App. at 962. In light of the totality of this evidence, a fact finder might give little credence to the charge of nepotism or favoritism concerning the lieutenants lists. Considering the history of animosity between Chief Wayne Stephens and Mayor Heydt, and the fact that James Stephens was the most outspoken opponent of Heydt's endorsement, a jury could reasonably find that Heydt's reasons for not promoting from the lieutenants lists are pretextual. We conclude that Stephens and Hanna have made a sufficient showing to discredit Heydt's proffered reasons for not promoting from the lieutenants lists and thus are entitled to have a fact finder determine whether their political affiliation or non-support was a substantial or motivating cause of the failure to promote.

**D.**

**Claims Against Kerrigan**

Plaintiffs' complaint asserts the same claim under§ 1983 as to Kerrigan as it does against Heydt and the City. However, Kerrigan is a private actor who does not ordinarily act "under color of state law." To succeed against a private defendant in a § 1983 suit, a plaintiff must show that "there is a sufficiently close nexus between the State and the challenged action so that the latter may be fairly treated

23

as that of the State itself." Blum v. Yaretsky, 457 U.S. 991, 1004 (1982) (internal citation omitted); see Burton v. Wilmington Parking Auth., 365 U.S. 715, 725 (1961); Melo v. Hafer, 912 F.2d 628, 638 (3d Cir. 1990), aff 'd, 502 U.S. 21 (1991).

Only if Kerrigan acted "with the help of or in concert with state officials" to deprive plaintiffs of their constitutional rights will plaintiffs have demonstrated the state action requirement under the Fourteenth Amendment that underlies a § 1983 claim. McKeesport Hosp. v. Accreditation Council for Graduate Med. Ed., 24 F.3d 519, 524 (3d Cir. 1994); see Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970); Mark v. Borough of Hatboro, 51 F.3d 1137, 1142 (3d Cir.), cert. denied, 116 S.Ct. 165 (1995).

The crux of plaintiffs' conspiracy theory is that "Kerrigan and Heydt . . . agreed that, if elected, Defendant Heydt would fire then Chief of Police, Wayne Stephens and help advance Kerrigan's career by subverting the . . . promotion list procedures. In exchange . . . Kerrigan agreed to arrange for [the FOP] to publicly endorse Heydt." Complaint, app. at 18. As noted earlier, plaintiffs have adduced circumstantial evidence indicating that Heydt was receiving information concerning the management of the Police Department that may be inferred to have come from members of the FOP leadership. However, there is little, if any, evidence that Kerrigan conspired with Heydt specifically with regard to plaintiffs' promotions.

The FOP endorsement preceded the publicizing of the promotion lists. By the time the promotion lists came out, which was the week before the mayoral election, the FOP endorsement had already been rescinded. At the time Kerrigan and the FOP leadership campaigned for Heydt's endorsement, they could not have known that they had placed low on the lists and that plaintiffs had placed high.

Plaintiffs contend that an inference can be drawn that Kerrigan, as president of the FOP, sought to influence Mayor Heydt's staffing decisions regarding police personnel in a significant way, and that Heydt may have acted on these recommendations. They offer no evidence that Kerrigan's alleged advice, even if politically motivated, rose

24

to the level of a conspiracy between Kerrigan and Heydt, so much so that it can be said that a "working relationship" existed by which Kerrigan was "drap[ed] . .. with the power of the state." Cruz v. Donnelly, 727 F.2d 79, 82 (3d Cir. 1984).

Here, like in Cruz, there is no basis tofind that the decisionmaker relinquished his power to make promotions. See id. at 81. The choice to make staffing decisions remained that of the Mayor. At most, Kerrigan's advice – if indeed he gave any – was favorable to the FOP leadership. In the absence of any evidence from which a reasonable fact finder could determine otherwise, we cannotfind that Heydt "clothe[d] [Kerrigan] with the under color of state law' vestment." Melo, 912 F.2d at 639.

Plaintiffs have also sought to assert a claim against Kerrigan under 42 U.S.C. § 1985(3). Section 1985(3) provides for recovery of damages against "two or more persons in any State [who] conspire . . . for the purpose of depriving . . . any person . . . of having and exercising any right or privilege of a citizen of the United States." The district court dismissed the § 1985(3) claims on the ground that that section does not authorize relief for discrimination based on political association.

This court has "reserved comment on whether `1985(3) embraces private conspiracies to discriminate on the basis of other factors other than race,' " Robison v. Canterbury Village, Inc., 848 F.2d 424, 430 n.7 (3d Cir. 1988) (quoting Rogin v. Bensalem Township, 616 F.2d 680, 697 (3d Cir. 1980)); see also C&K Coal Co. v. United Mine Workers, 704 F.2d 690, 700 (3d Cir. 1983), although we note that other circuits have held that it does, see, e.g, Hobson v. Wilson, 737 F.2d 1, 21 (D.C. Cir. 1984), cert. denied , Brennan v. Hobson, 470 U.S. 1084 (1985); Keating v. Carey, 706 F.2d 377, 379 (2d Cir. 1983); Glasson v. City of Louisville, 518 F.2d 899, 912 (6th Cir.), cert. denied, 423 U.S. 930 (1975), and some district courts in this circuit have agreed, see Perez v. Cucci, 725 F.Supp. 209, 249–51 (D.N.J. 1989), aff 'd, 898 F.2d 139 (1990).

Once again we do not have to resolve that question, because the predicate of § 1985(3) liability is a "conspiracy,"

and, as discussed above, plaintiffs have not provided sufficient proof of a conspiracy between Heydt and Kerrigan to survive summary judgment. We will accordingly affirm the district court's entry of judgment in Kerrigan's favor without adopting its limitation on the reach of§ 1985(3).

**III.**

**CONCLUSION**

For the foregoing reasons we will reverse in part and affirm in part and remand to the district court for further proceedings consistent with this opinion.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

26