**In re PASTEURIZED EGGS CORPORATION,**
**Debtor.**

**Pasteurized Eggs Corporation,**
**Plaintiff,**

v.

**Bon Dente Joint Venture, a Washington Joint Venture, Defendant.**

**Bankruptcy No. 02–13086–JMD.**
**Adversary No. 02–1148–JMD.**

United States Bankruptcy Court, D. New Hampshire.

May 30, 2003.

Charles A. Dale, Gadsby Hannah LLP, Boston, Massachusetts, Steven M. Noting-

er, Donchess & Notinger, Nashua, New Hampshire, for Debtor.

D. William Toone, Dorsey & Whitney LLP, Seattle, Washington, John M. Sullivan, Daniel P. Luker, Preti, Flaherty, Beliveau, Pachios & Haley, PLLC, Concord, New Hampshire, for Defendant.

Todd A. Feinsmith, Brown Rudnick Berlack Israels LLP, Boston, Massachusetts, for Unsecured Creditors Committee.

Henry DeWerth–Jaffe, Pepper Hamilton LLP, Wilmington, Delaware, Gregory A. Moffett, McCaffrey & Moffett, PLLC, Concord, New Hampshire, for Footbridge Capital, LLC.

### MEMORANDUM OPINION

J. MICHAEL DEASY, Bankruptcy Judge.

## I. INTRODUCTION

The Debtor filed a complaint (Doc. No. 1) against Bon Dente Joint Venture ("BDJV") seeking six declaratory judgments listed in three counts. Counts I and II seek a determination (i) that the patents and trademarks comprising Thermal-Pure™ Technology (the "Technology"), as defined in the Patent Purchase Agreement dated January 2, 1997 (the "Patent Purchase Agreement") are property of the bankruptcy estate under section 541 of the Bankruptcy Code;[1] (ii) of the validity, priority and extent of BDJV's secured claim, if any; (iii) that the avoidance under section 544 of the Bankruptcy Code of any BDJV security interest which is unperfected; and (iv) that BDJV's right to future payments under the Patent Purchase Agreement constitutes a prepetition general unsecured claim. Count III seeks a determination that as of the petition date (i) no reversion of the Technology had

occurred under the Patent Purchase Agreement and (ii) the Master Agreement negotiated in September 2001 had not become effective. BDJV filed an answer (Doc. No. 6) contesting all of the Debtor's claims for declaratory relief and filing three counterclaims for (i) breach of the Patent Purchase Agreement, (ii) a declaratory judgment that the Master Agreement is valid and (iii) damages for interference with prospective business relations. The Debtor filed Debtor's Motion for Partial Summary Judgment (Doc. No. 14) (the "Motion") seeking summary judgment as to Counts I and II of its complaint. The Court held a hearing on March 25, 2003 and took the matter under submission.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. FACTS

In January 2001, Pasteurized Eggs LP ("PELP") and The Davidson Group Egg Shell Corporation ("Davidson Group") were merged into a newly formed corporation, Pasteurized Eggs Corporation, the Debtor and Plaintiff in this proceeding. BDJV is the successor in interest to Dr. James P. Cox ("Dr. Cox"), R.W. Duffy Cox ("Duffy Cox"), Ramtek, Inc. and Bon Dente International. Dr. Cox and Duffy Cox obtained patents for the pasteurization of fresh in shell eggs known as the ThermalPure™ process and received one trademark for such technology (collectively the "Technology"). On January 2, 1997 Dr. Cox and Duffy Cox entered into an

---

[1] Unless otherwise indicated, all references to statutory sections (the "Bankruptcy Code" or "Code") are to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. § 101 et seq.

agreement with the PELP and Davidson Group involving a transfer of rights to the Technology (the "Patent Purchase Agreement").[2]

The Patent Purchase Agreement recites that it was executed subsequent to the resolution of disputes under prior agreements between the parties involving the licensing, marketing and sublicensing of the Technology. Under section 2 of the Patent Purchase Agreement, BDJV agreed, subject to certain option conditions, "to transfer and assign to [the Debtor] all of its respective rights, titles and interests" in the Technology, any future patents and improvements within the scope of the Technology, and any trademarks and associated goodwill. The option conditions in sections 4(a) through (c) conveyed to the Debtor the right to acquire the worldwide rights to the Technology by paying $1,465,000.03 in thirteen quarterly installments between the date of the agreement and October 1, 1999. Section 4(e) of the Patent Purchase Agreement provided that upon completion of the option payments "the Option shall be fully exercised and the assignments of all substantial patent and trademark rights for the ThermalPure[TM] Technology will become fully vested in [the Debtor] by operation of this Agreement." After the completion of the option payments, sections 5 and 6 provide for the payment of certain royalty payments to BDJV over the term of the agreement. The term of the Patent Purchase Agreement is twenty years or until the last of the Technology rights expire, whichever is greater, unless terminated sooner under the terms of the agreement. Under section 10 of the Patent Purchase Agreement, BDJV has the right to terminate the agreement if any of the option payments or royalties are not paid within a specified time after written notice. The parties also agreed that upon termination of the Patent Purchase Agreement the Technology, including all improvements and trademarks would be transferred to BDJV by operation of the agreement and that such transfer was the sole remedy available to BDJV. During the term of the Patent Purchase Agreement, BDJV retained certain rights with respect to the Technology including:

1. the right to object to the Debtor's choice of patent and trademark counsel, which objection could not be unreasonably asserted, and the right, at its own expense, to review and assist the Debtor in the prosecution of patent applications and litigation, so long as it does not unduly delay or interfere with the conduct of such matters by the Debtor's counsel;

2. the right to file patent and trademark applications for rights accruable from the Technology that the Debtor determined that it did not desire to seek protection for; and

3. the right, at its own expense, to prosecute or defend any action for infringement or misappropriation of any patent, trademark or trade secret covered by the Patent Purchase Agreement if within six months of the statutory limits governing such actions the debtor determines not to undertake or to abandon such actions.

2. It is undisputed for the purposes of this adversary proceeding and the Patent Purchase Agreement, that BDJV is the successor in interest to the rights and obligations of Dr. Cox, Duffy Cox, Ramtek, Inc. and Bon Dente International, and that the Debtor is the successor in interest to the rights and obligations of PELP and the Davidson Group. Accordingly, the Court shall hereinafter refer to the contracting parties as "BDJV" and the "Debtor" whenever they, or their predecessors in interest, were parties to an act or omission.

There is no material dispute that the Debtor made all of the Option payments required under section 4 of the Patent Purchase Agreement.[3] Likewise, there is no material dispute that the Debtor made all royalty payments required under the Patent Purchase Agreement through the middle of 2001.[4] On August 16, 2001, BDJV sent a Notice of Breach and Intent to Terminate (the "Notice") to the Debtor due to the Debtor's failure to pay a portion of the minimum royalty due under section 6(b) for the second quarter of 2001 in the amount of $37,564.11, and the third quarter of 2001 in the amount of $112,692.31 for a total due of $150,256.42. The Notice advised the Debtor that it was required to cure the entire arrearage within thirty days, as set forth in section 10(b) of the Patent Purchase Agreement. In a letter dated September 10, 2001, BDJV extended the termination date in the Notice to October 1, 2001.

During September 2001, the Debtor's Chief Executive Officer negotiated an agreement with BDJV entitled "Master Agreement." Under the terms of the Master Agreement, the Debtor agreed (i) to grant BDJV a license to use the Technology in the southwestern United States (the "Southwest License"); (ii) that the Debtor owed BDJV $375,000.00 for past and future payments due under the Patent Purchase Agreement; (iii) that $100,000.00 of such amount would be offset against the initial payment to be due to the Debtor from BDJV under the Southwest License;

(iv) that the $275,000.00 balance would be paid to BDJV by the Debtor in two equal installments on February 1 and July 1, 2002; (v) that the notice of termination was rescinded; and (vi) that except to the extent that the payment obligations under the Patent Purchase Agreement had been amended by the Master Agreement, the Patent Purchase Agreement remained in full force and effect. The Debtor also represented and warranted that the Master Agreement was duly authorized, executed and was binding upon the Debtor, subject only to approval under the terms of a "certain Status Quo Order of the Delaware Chancery Court in C.A. No. 18972–NC" (the "Delaware Order").

The Delaware Order was issued on July 25, 2001 pursuant to a stipulation between the parties in a prepetition dispute among the directors of the Debtor regarding the election and removal of directors and control of the Debtor. Under the terms of the Delaware Order after May 25, 2001, the board of directors of the Debtor consisted of five named individuals and was prohibited from taking certain actions outside the ordinary course of business, including "engaging in, entering into, or agreeing to any transaction, contract or agreement, the value of which exceeds $25,000" without the approval of at least four of the five directors of the Debtor. On September 27, 2001 the Debtor made a payment to BDJV in the amount of $375,641.04. The parties agree that this

---

3. Prior to the end of the option payment period on December 31, 1999, the Debtor was late in making several payments. As a result of the issuance of several notices of termination by BDJV the quarterly payment schedule under the Patent Purchase Agreement was amended to a monthly payment schedule, the Debtor relinquished one of the patents which was part of the Technology and the Debtor issued a one percent equity interest to BDJV. However, there is no material dispute that all payment defaults were cured within the time

frames and on the terms negotiated between the parties from time to time.

4. The record reflects much correspondence between the parties regarding notices of default, deferred payment agreements and other agreements which the parties treated as a cure of any breach which was the subject of all notices of termination prior to August 16, 2001.

payment was made on or about September 27, 2001. However, they disagree over the characterization of the payment. The Debtor contends that the Master Agreement was never authorized under the terms of the Delaware Order and, therefore, the Master Agreement is null and void. Notwithstanding the fact that the Debtor contends that the Master Agreement is null and void, it contends that the September 27, 2001 payment brought the Debtor not only completely current on all royalty payments before the extended deadline of October 1, 2001, it also paid future minimum royalty payments. BDJV contends that the extension of the original thirty day deadline in the Notice to October 1, 2001 was based upon a letter of intent between the Debtor and BDJV under which the parties agreed to the terms to be included in the Master Agreement, including the modified royalty payment schedule. BDJV contends that the Master Agreement was authorized, or at least negotiated with the knowledge of the Debtor's board of directors and if it is not binding upon the Debtor, then the Debtor failed to complete the agreed upon cure (i.e., payment of past due royalties and execution of the Master Agreement) prior to the October 1, 2001 extended deadline and the Notice was never rescinded.

In February 2002, BDJV caused a copy of the Patent Purchase Agreement to be recorded with the United States Patent and Trademark Office (the "PTO"), which the Debtor contends confirms that title to the Technology had passed to the Debtor. BDJV, however, disputes the Debtor's characterization of the effect of the PTO filing, arguing instead that the documents recorded were copies of prior license agreements and not assignments of title. More specifically, BDJV asserts that it recorded copies of the three relevant agreements (the Patent Purchase Agreement, the December 2000 license agreement, and the Master Agreement), and that each of the three agreements references the same ten patents for a total of thirty patent references.

## III. DISCUSSION

Under Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056, a summary judgment motion should be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "Genuine," in the context of Rule 56(c), "means that the evidence is such that a reasonable jury could resolve the point in favor of the nonmoving party." *Rodriguez–Pinto v. Tirado–Delgado,* 982 F.2d 34, 38 (1st Cir. 1993) (quoting *United States v. One Parcel of Real Property,* 960 F.2d 200, 204 (1st Cir.1992)). "Material," in the context of Rule 56(c), means that the fact has "the potential to affect the outcome of the suit under applicable law." *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir.1993). Courts faced with a motion for summary judgment should read the record "in the light most flattering to the nonmovant and indulg[e] all reasonable inferences in that party's favor." *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir.1994).

### A. Whether the Technology is Property of the Estate

The first issue before the Court is whether the intellectual property rights comprising the Technology are property of the bankruptcy estate. Section 541(a)(1) of the Bankruptcy Code provides that property of a bankruptcy estate includes "all legal or equitable interests of the debt-

or in property as of the commencement of the case." *Ostrander v. Lalchandani (In re Lalchandani)*, 279 B.R. 880, 883 (1st Cir. BAP 2002). Section 541 is construed broadly to bring any and all of the debtor's property rights within the bankruptcy court's jurisdiction and the umbrella of protections granted by the Bankruptcy Code, and to promote the goal of equality of distribution. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205, n. 9, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). Whether an interest claimed by the debtor is "property of the estate" is a federal question to be decided by federal law; whether and to what extent the debtor has a legal or equitable interest in claimed property is determined by state law. *Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

The Debtor asserts that it acquired ownership rights to the Technology pursuant to the Patent Purchase Agreement, and that therefore the intellectual property rights are property of the estate. BDJV responds, however, that there is a material issue of fact regarding the Debtor's pre-petition ownership of the Technology, asserting that because BDJV retained certain rights to the Technology under the Patent Purchase Agreement, the Patent Purchase Agreement conveyed a mere license rather than title to the Technology.

Although no cases in this jurisdiction discuss in the context of a bankruptcy case the effect of a transferor's retention of rights under a patent assignment, the Supreme Court's decision in *Waterman v. Mackenzie* discusses the issue in the context of standing, which is instructive in the instant case.[5] *See generally Waterman v. Mackenzie*, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923 (1891). In *Waterman*, the Court held that a transferor did not have standing to sue under the patent where the transferor had assigned the entire patent right and retained only insignificant rights to the patent. *Id.* at 257, 260–61, 11 S.Ct. 334. There, the transferor had assigned by deed all right, title and interest in the invention and the patent, with an express provision that the assignment would be null and void if she and/or her husband satisfied by a date certain a promissory note held by the transferee. *See id.* at 257, 11 S.Ct. 334. The deed was recorded with the PTO. *Id.* at 258, 11 S.Ct. 334. The Court likened the instrument to a mortgage, reasoning that the conditional assignment served as collateral for the promissory note and did not diminish the extent of the assignment. *See id.* The Court further reasoned that because the assignment transferred the whole title in the patent to the transferee under the duly executed and recorded mortgage, the transferee was the only person entitled to bring suit under the patent. *See id.* at 261, 11 S.Ct. 334. Thus, in *Waterman*, the transferor's "reversionary" right to take back title upon timely payment of the promissory note did not render the transfer less than a complete assignment. *See id.*

In the instant case, the Patent Purchase Agreement provided for BDJV "to transfer and assign to [the Debtor] all of its respective rights, titles and interests" in the Technology, any future patents and improvements within the scope of the Technology, and any trademarks and associated goodwill. *See* Complaint, Appendix A § 2. Such language appears to constitute an absolute assignment of title to the Debtor. *See Waterman*, 138 U.S. at 256–57, 11 S.Ct. 334. To the extent there is any doubt regarding the absoluteness of the original assignment provided in Para-

---

**5.** At oral argument all parties agreed that the cases on standing apply to this case.

graph 2,[6] the language in Paragraph 4 regarding option payments eliminates any such doubt. Paragraph 4 conveys "an option to acquire the worldwide rights to the [...] Technology," and states that upon completion of the option payments "the assignments of all substantial patent and trademark rights for the [...] Technology will become fully vested in [the Debtor]." *See* Complaint, Appendix A § 4. Upon the Debtor's completion of the option payments, then, the absolute assignment provided in Paragraph 2 became vested.

There is no genuine dispute regarding the Debtor's pre-petition satisfaction of the option payments. According to the sworn affidavit of James Rand, all option payments were made. *See* Rand Affidavit ¶ 7. In its answer to the Debtor's complaint, BDJV makes the vague assertion that "[the Debtor] did not make all of the payments as required by the [Patent Purchase] Agreement," but does not specify which payments (i.e., royalty or option payments). Likewise, BDJV's Objection to the Debtor's Motion makes similar vague assertions regarding BDJV's acceptance of the September 27, 2001 payment, but never specifies the nature of the payment (again, royalty or option payment). *See* BDJV's Objection to Debtor's Motion at 15–17. More importantly, BDJV has failed to put facts on the Summary Judgment record raising a factual dispute that the Debtor failed to make the option pay-

ments. *See, e.g.,* Cox Affidavit at ¶¶ 4–12 (reciting various amendments made to the Patent Purchase Agreement to accommodate the Debtor's late option payments, but making no statement that the Debtor ultimately failed to make said payments in accordance with the amended terms of the Patent Purchase Agreement). The Court notes as well that at oral argument BDJV's counsel did not disagree when the Court stated directly to him that the option payments had been made in accordance with the terms of the Patent Purchase Agreement as amended.[7]

■ Lastly, there is no provision in the Patent Purchase Agreement that defeats the absolute assignment. Limited rights and a limited geographical area are the tell tale signs of a license; there are no such limitations in the Patent Purchase Agreement. The "reversion" whereby BDJV reserves certain rights relating to protection of the patent does not render the transfer a mere license rather than a complete assignment. *See Waterman,* 138 U.S. at 256–57, 11 S.Ct. 334. Instead, such a retention of rights protects the assignor if the assignee fails to make required royalty payments, and may create a security interest. *See Cybernetic Services, Inc. v. Matsco, Inc. (In re Cybernetic Services, Inc.),* 252 F.3d 1039, 1044 (9th Cir.2001), *affm'g* 239 B.R. 917 (9th Cir. BAP 1999), (discussing requirements for perfection of security

---

**6.** Under the *Waterman* standard, title to the Technology appears to have passed to the Debtor upon execution of the Patent Purchase Agreement on January 2, 1997. However, the Court does not need to reach the issue as there is no question that title passed upon the Debtor's pre-petition satisfaction of the option payments.

**7.** The audio recording of the February 25, 2003 hearing reflects that the Court made the following statement to BDJV's counsel, which BDJV's counsel did not dispute:

I look in section 2 [of the Patent Purchase Agreement] and it says "subject to section 4," which apparently everyone agrees whatever paragraph 4, or section 4, had in it has been met. I mean, the payments were all made, and they were made on time within the scope of the agreement, because even if they were late under the original draft, that was waived or cured by some other agreement so whatever payments had to be made under 4 to trigger its effects apparently had been made.

interest in a patent, where parties stipulated to existence of the security interest).

The Court thus finds that under the terms of the Patent Purchase Agreement, the transfer constituted an absolute assignment of title to the Debtor. As there is no genuine dispute of material fact regarding the Debtor's pre-petition satisfaction of the option payments, the Court further finds that title passed to the Debtor pre-petition and that the Technology is therefore property of the Debtor's bankruptcy estate.

### B. Avoidance of Security Interest

 Section 544 of the Bankruptcy Code allows the Debtor to assume the role of a hypothetical lien creditor and avoid any unperfected security interest. *See* 11 U.S.C. § 544(a)(1). Whether a security interest is perfected is generally a state law issue, even where the secured property is a patent. *See Cybernetic,* 252 F.3d at 1043. In *Cybernetic,* the Ninth Circuit held that a security interest in a patent was perfected where the assignor had complied with California UCC filing requirements but had not recorded the security interest with the PTO. *See id.* at 1059. There, the court concluded that Article 9 of California's UCC governs the method for perfecting a security interest in patents, as Article 9 applies to "general intangibles," which includes intellectual property. *See id.* at 1045 (*citing* Cal. Com.Code § 9106).

The *Cybernetic* court further concluded that the Patent Act does not preempt the UCC with respect to perfection of security interests, because the Patent Act addresses filings only with respect to transfers in ownership but not with regard to security interests.[8] *See id.* (*citing* 35 U.S.C.

§ 261). The *Cybernetic* court underscored this point by noting that the Copyright Act does include such a provision. *See id.* at 1056. The court noted that "[t]he Copyright Act governs any 'transfer' of ownership, which is defined by the statute to include any 'hypothecation.'" *See id.* (*citing* 17 U.S.C. §§ 101, 201(d)(1)). Black's Law Dictionary defines a "hypothecation" as the "pledging of something as security without delivery of title or possession." *Id.* By contrast, the Patent Act does not refer to "hypothecation" or security interests. *Id.* The court concluded that the inclusion of a security interest provision in the Copyright Act "is more evidence that security interests are *outside* the scope of [the Patent Act]." *Id.* (emphasis in original) (*citing* 35 U.S.C. § 261).

In an earlier incarnation of *Cybernetic,* the Ninth Circuit Bankruptcy Appellate Panel pointed to aircraft and railroads as two additional areas in which Congress has established a federal filing system for liens. *See Moldo v. Matsco, Inc. (In re Cybernetic Services, Inc.),* 239 B.R. 917, 922, nn. 13, 14 (9th Cir. BAP 1999) (*citing* UCC 9–302, Official Comment 8). There, the Panel contrasts the Patent Act, which contains no provision regarding perfection of security interests, with statutes that clearly establish a federal filing system and therefore preempt state requirements. Regarding liens on aircraft, 49 U.S.C. § 44107(a)(2) provides: "'[u]nder § 44108, the failure to file a security instrument with the FAA administrator precludes constructive notice of the existence of the security instrument and consequently limits the parties against whom it is valid.'" *See id.* (*quoting* 49 U.S.C. § 44107). Regarding liens on railroad-related property,

---

**8.** For a fuller discussion of the issues and conclusions regarding this issue, see the Ninth Circuit's thorough and well reasoned analysis in *Cybernetic.* *See generally Cybernetic,* 252 F.3d 1039.

49 U.S.C. § 11301 provides that a "mortgage ... or security interest in vessels, railroad cars, locomotives, or other rolling stock ... shall be filed with the Board in order to perfect the security interest that is the subject of such instrument." *See id.* (*quoting* 49 U.S.C. § 11301). Unlike the language in these statutes, the Patent Act does not contain any language regarding security interests, and therefore does not preempt state law. *See id.* As such, perfection of a security interest in a patent requires filing a UCC–1 in accordance with state law. Filing a security agreement with the PTO does not perfect the security interest.

In the instant case, BDJV filed with the PTO copies of several agreements between it and the Debtor, including the Patent Purchase Agreement. *See* Cox Affidavit ¶ 23. As noted previously, the Court has not reached the issue of whether any language in the Patent Purchase Agreement created a valid security interest. However, even assuming that the Patent Purchase Agreement does contain such language, the PTO filing does not perfect a security interest. *See Cybernetic,* 252 F.3d at 1059. Instead, BDJV should have filed a UCC–1 in accordance with the Illinois Uniform Commercial Code.[9] BDJV has made no such filings. According to the Motion, lien searches conducted after the petition date revealed that BDJV did not file UCC–1 financing statements in any state. *See* Debtor's Memorandum of Law in Support of Motion (the "Debtor's Memorandum") ¶ 33. BDJV has put no facts on the Summary Judgment record to dispute the Debtor's statement. As such, any security interest that may have been created is unperfected and is therefore avoided pursuant to the Debtor's exercise of it "strong-arm power" under section 544 of the Bankruptcy Code.

### C. Secured Status of Any Claim by BDJV to Future Payments

The Debtor seeks declaratory judgment that BDJV's right to future payments from the Debtor under the Patent Purchase Agreement constitutes a general unsecured claim. BDJV has not countered the Debtor's argument or put any facts on the Summary Judgment record regarding this issue, presumably because any argument relating to this issue is subsumed by BDJV's prior arguments relating to the "reversionary" rights and security interest.

■ As previously discussed, any security interest BDJV may have acquired under the Patent Purchase Agreement is unperfected and has been successfully avoided by the Debtor pursuant to section 544. Under section 502(d), a secured claim that is avoided under section 544 is disallowed.[10] 11 U.S.C. § 502(d). The creditor is then left with an unsecured claim. *See In re Octagon Roofing,* 156 B.R. 214, 220 (Bankr.N.D.Ill.1993). In *Octagon,* the bankruptcy court held that a secured claim that was avoided under section 544 was disallowed and an unsecured claim remained. *See id.* As such, any claim BDJV has against the Debtor constitutes a general unsecured claim. *See*

---

9. Section 13 of the Patent Purchase Agreement provides that "the rights of the parties shall be determined under the laws of the State of Illinois." *See* Complaint, Appendix A § 4. Like California, the Illinois UCC applies to intellectual property. *See* 810 ILCS § 5/9–102, Official Comment 5(d) (defining "general intangible" to include intellectual property).

10. Section 502(d) of the Bankruptcy Code provides in pertinent part that "the court shall disallow any claim of any entity from which property [...] is a transferee of a transfer avoidable under section [...] 544." 11 U.S.C. § 502(d).

*id.* The validity and extent of any such claim has yet to be determined.

### D. Validity, Priority and Extent of BDJV's Secured Claim

In Count II, the Debtor seeks a declaration concerning the validity, priority, and extent of any secured claim of BDJV. BDJV's retention of rights under the Patent Purchase Agreement may have created a security interest. *See Cybernetic,* 252 F.3d at 1044. As discussed previously, however, the Court need not decide whether a valid security interest exists in this case, because even assuming a valid security interest, it is unperfected and therefore avoidable in bankruptcy. *See id.* at 1059. As the Debtor has exercised its avoidance power under section 544, BDJV does not hold a secured claim.

## IV. CONCLUSION

For the reasons discussed above, the Court finds that the Technology is property of the Debtor's bankruptcy estate. Any security interest that may have been created under the Patent Purchase Agreement is unperfected and avoided under section 544. Any claim BDJV holds against the Debtor is a general unsecured claim. Accordingly, the Debtor's Motion is GRANTED. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. The Court will issue a separate judgment consistent with this opinion.